# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **RONALD PHILLIPS,** | : | **Case  No.  5:03 CV 875** |
| | : | |
| **Petitioner,** | : | |
| | : | **JUDGE KATHLEEN M. O'MALLEY** |
| **vs.** | : | |
| | : | |
| **MARGARET BRADSHAW, Warden,** | : | **MEMORANDUM & ORDER** |
| | : | |
| **Respondent.** | : | |

Ronald Phillips petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Phillips challenges the constitutional sufficiency of his conviction by a jury for aggravated capital murder, and also challenges the constitutionality of the imposition of a sentence of death.

For the reasons set forth below, Phillips's petition for a writ of habeas corpus is **DENIED**.


## I. PROCEDURAL HISTORY

On January 18, 1993, three-year-old Sheila Marie Evans died from cardiovascular collapse.  Detectives from the Akron Police Department interviewed Phillips on that day.  Police interviewed Phillips again on January 20, 1993, at which time he confessed that he had beat

Evans on the day of her death and digitally penetrated her anus on that date.  He further admitted to anally raping her on previous occasions.  After completing a written statement of his confession, Phillips was arrested.

On February 1, 1993, a Summit County Grand Jury indicted Phillips on seven counts: (1) aggravated murder of Sheila Marie Evans in violation of Ohio Revised Code § 2903.01(B) with a death penalty specification and in violation of Ohio Revised Code § 2929.04(A)(7), committing the murder after committing or attempting to commit rape and was the principal offender in the commission of the aggravated murder; (2) felonious sexual penetration in violation of Ohio Revised Code § 2907.12(A)(1)(b); (3) endangering children in violation of Ohio Revised Code § 2919.22(B)(2) with a deadly weapon specification; (4) Felonious assault in violation of Ohio Revised Code § 2903.11(A)(1);[1] and, (5), (6), (7) rape of Sheila Marie Evans in violation of Ohio Revised Code § 2907.02(A)(1)(B).

Phillips filed a motion to suppress his confession on May 28, 1993.  After conducting a hearing, the trial court denied the motion.  Phillips plead not guilty to all charges and a jury trial commenced on August 9, 1993.[2]  He was represented by appointed counsel Kerry O'Brien and Michael Edminister.  The jury convicted Phillips on all counts on August 18, 1993.  After a mitigation hearing, it then sentenced him to death.  The trial court accepted the jury's recommendation and issued a sentencing opinion on October 5, 1993.

Represented by the same counsel, Phillips filed a timely appeal on October 12, 1993.  The

---

[1]     Counts three and four were dismissed by the State prior to trial.

[2]     Evans's mother, Fae Evans had been indicted jointly with Phillips for involuntary manslaughter and child endangering.  She was tried and convicted prior to the commencement of Phillips's trial.

2

Ninth District Court of Appeals affirmed the convictions and sentences.  State v. Phillips, No.

C.A. 16487, 1994 WL 479164 (Ohio Ct. App. Aug. 31, 1994).  Represented by the Office of the

Ohio Public Defender, Phillips appealed to the Ohio Supreme Court, raising thirty propositions

of law.  On November 22, 1995, the Ohio Supreme Court affirmed Phillips's convictions and

sentences.  State v. Phillips, 656 N.E.2d 643 (Ohio 1995).  Completing his direct appeal, Phillips

filed a petition for a writ of certiorari with the United States Supreme Court, which the Court

denied.  Phillips v. Ohio, 517 U.S. 1213 (1996).

Phillips filed a timely petition for post-conviction relief on September 20, 1996.  After

denying his motion for an evidentiary hearing, the post-conviction court issued its finding of

facts and conclusion of law, dismissing the petition.  State v. Phillips, No. CR-93-02-0207(A),

slip op., (Ohio Ct. Common Pleas June 21, 1998).  Phillips appealed the post-conviction court's

decision.  Finding that the post-conviction court's findings of fact and conclusions of law were

insufficient, the Ninth District Court of Appeals affirmed in part and remanded in part for the

trial court to issue a more specific finding.  State v. Phillips, No. 18940, 1999 WL 58961 (Ohio

Ct. App. Feb. 3, 1999).  Phillips appealed the Ninth District's decision but the Ohio Supreme

Court declined to exercise jurisdiction on June 16, 1999.  State v. Phillips, No. 99-521, slip op.

(Ohio June 16, 1999).

After remand, the post-conviction court issued its second findings of fact and conclusions

of law, once again dismissing the petition.  State v. Phillips, No. CR 93-02-0207(A), slip op.

(Ohio Ct. Common Pleas July 11, 2001).   Phillips appealed this decision on August 6, 2001.

The Ninth District Court of Appeals affirmed.  State v. Phillips, No. 20692, 2002 WL 274637

(Ohio Ct. App. Feb. 27, 2002).  Phillips appealed to the Ohio Supreme Court but that court

3

declined to exercise jurisdiction and dismissed the appeal as not involving any substantial

constitutional question.  State v. Phillips, No. 02-581, slip op, (Ohio June 12, 2002).


## II. FACTUAL HISTORY

In its consideration of Phillips's direct appeal, the Ohio Supreme Court set out the factual

history of this case, as revealed by the evidence adduced at Phillips's trial.  The facts surrounding

the underlying incident are as follows:

> On January 18, 1993, Sheila Marie Evans, age three, died as a result of
> cardiovascular collapse due to, inter alia, severe, blunt force trauma to her
> abdomen. At the time, Sheila's mother, Fae Evans, was dating and occasionally
> cohabiting with appellant, Ronald Ray Phillips. In addition to Sheila, Evans had
> two other children, Sara, twenty-nine months old, and Ronald, Jr., appellant's
> infant son.
>
> Shortly after 10:00 a.m. on the morning of January 18, 1993, Fae Evans took
> Ronald, Jr. to see the family physician for a routine physical examination.
> Appellant remained at Evans's apartment to care for Sheila and Sara. Evans
> returned to the apartment at approximately 11:25 a.m. and found appellant sitting
> in the kitchen. Soon thereafter, Evans called out to her daughters, but they failed
> either to respond or to appear. Appellant walked into the girls' bedroom and found
> Sheila lying on her bed motionless, pale and cold. He then lifted Sheila and
> carried her downstairs to his grandmother's apartment. Hazel Phillips, appellant's
> grandmother, telephoned the 911 emergency operator, reported that Sheila was not
> breathing, and relayed instructions on performing cardiopulmonary resuscitation
> to appellant. Appellant in turn attempted to revive Sheila until medical assistance
> arrived.
>
> Paramedics from the city of Akron responded to the 911 call within four minutes
> of being dispatched and immediately transported Sheila to Children's Hospital in
> Akron. Upon her arrival at the emergency room, Sheila was not breathing and had
> no pulse. The first physician to examine Sheila, Dr. Eugene Izsak, noted that she
> had multiple bruises on her torso, a distended stomach, apparent internal
> abdominal injuries, and a stretched anus with some acute, recent changes. Dr.
> Izsak's medical team continued cardiopulmonary resuscitation and was eventually

4

able to obtain a pulse. Sheila was transported to the operating room after spending approximately one hour in the emergency room. Dr. Robert Klein performed emergency abdominal surgery, which revealed that Sheila's abdominal cavity was filled with a significant amount of free air and blood, and that a portion of her intestine, the duodenum, was perforated and gangrenous. Dr. Klein removed the dead portion of the intestine, and attempted to control the internal bleeding. Based upon his observations, Dr. Klein determined that the injury to the duodenum had been inflicted at least two days prior to Sheila's admission into the hospital. Despite the significant medical efforts performed at Children's Hospital, Sheila died later that day.

On January 19, 1993, Dr. William Cox, the Summit County Coroner, conducted an autopsy on Sheila. During his external examination of Sheila, Dr. Cox documented more than one hundred twenty-five bruises, many of which he identified as acute injuries that had been inflicted within a few hours of death. The bruising indicated that Sheila had been severely beaten about her head, face, upper and lower torso, arms, legs, and genitalia. He also detailed that the blows to Sheila's abdomen had resulted in severe internal trauma, including hemorrhaging in her stomach, intestine and other internal organs. Dr. Cox examined the section of Sheila's bowel that had been surgically removed, and determined that the injury to the duodenum had occurred approximately forty-eight hours prior to her death. During that forty-eight-hour period, Dr. Cox opined, Sheila would have suffered from intense abdominal pain, an inability to eat, vomiting, a high temperature, and listlessness. The beating Sheila suffered on the morning of January 18, 1993 caused the already necrotic and gangrenous duodenum to rupture. Dr. Cox concluded that Sheila died as a result of cardiovascular collapse stemming from the severe, blunt force trauma to her abdomen, and the numerous related complications.

Dr. Cox also discovered during the autopsy evidence of acute anal penetration. Based upon the presence of contusions and lacerations, Dr. Cox determined that Sheila had sustained repetitive anal penetrations over a period of time, and that the most recent anal trauma had occurred sometime during the morning of January 18, 1993. Given the absence of abrasions within the rectum, Dr. Cox further concluded that Sheila had been anally penetrated by a penis rather than by a finger or some other foreign object.

At approximately 3:00 p.m. on the day Sheila died, Detective Jan Falcone, an officer with the Juvenile Bureau of the Akron Police Department, interviewed appellant at the police station. Although appellant was not placed under arrest, Falcone read appellant his Miranda rights, which he waived. During the interview, appellant admitted that on Friday, January 15, 1993, or Saturday, January 16, 1993, he had spanked Sheila three times with an open hand. After the spanking,

5

appellant noticed bruises on the girl's bottom, which surprised him. He said, "I really didn't think I spanked her that hard but I told Fae I would not do it any more." Appellant indicated that Sheila had not felt well during the weekend, and that she had vomited several times.

Appellant also told Falcone that Sheila had been injured on several previous occasions. He recalled one incident in which Sheila fell on a railroad spike which penetrated either her vagina or anus. On another occasion, appellant claimed that Sheila hurt her "vagina and stomach area" when she jumped from a dresser to a bed and struck the corner of the bed. Sheila bruised her eye and cut her lip when she fell down a flight of stairs. Appellant denied having ever touched Sheila or Sara in their "private areas."

At some point during the interview, appellant was informed that Sheila had died. Falcone then asked appellant again what had happened to Sheila. Appellant responded that the night before Sheila's death, he had observed Evans in the girls' bedroom standing over Sheila with both fists clenched after hearing Sheila scream, "Don't beat me." The interview ceased after that exchange, and appellant left the police station. In total, the interview lasted approximately seven hours, during which time appellant was provided with food, beverages, and several breaks.

On Wednesday, January 19, 1993, appellant telephoned the Akron police station in order to speak with the detectives who were investigating Sheila's death. Detective Ronald Perella, a detective assigned to the case, was attending Sheila's autopsy at the time appellant's call was received and thus was unable to immediately speak with appellant. The next morning, Perella and his supervisor, Sergeant Dye, drove to South Alternative School, where appellant was enrolled as a student. The officers met with appellant and asked him to return to the police department for further questioning. Appellant complied, was driven to the Juvenile Bureau of the police department, and taken to an interviewing room. Perella read appellant his Miranda rights, which he again waived, and asked appellant to share whatever additional information he wished to convey. Appellant then repeated the same information he had given to Detective Falcone on the previous day. The detectives questioned appellant as to why he had telephoned them if he simply wanted to reiterate his earlier statement. They also informed appellant that the coroner had performed an autopsy on Sheila, and therefore knew everything that had happened to her.

At that point, appellant asked Sergeant Dye to leave the room so that he could speak with Detective Perella alone. Dye agreed. Once they were alone, appellant told Perella, "I don't want to go to jail, I don't want to get pumped in the butt." Perella responded that "not everybody who gets arrested goes to jail, that there

6

could be counseling but without knowing what [appellant] wanted to talk about, that [Perella] couldn't promise him anything except to tell the prosecutor and the judge that he cooperated." Appellant then confessed that on the morning of January 18, 1993, he "lost it" and repeatedly hit Sheila. Appellant explained that he had called Sheila three times for breakfast and she had failed to respond. As a result, appellant went to the girls' bedroom, pulled the covers off Sheila, and began hitting her, throwing her against the walls, and dragging her by her hair. During the beating, appellant noticed that Sheila was not wearing underwear, which caused him to become sexually aroused. After beating Sheila, appellant stated he put Vaseline on her anus and inserted his fingers. While appellant admitted that he thought about anally penetrating the three-year-old girl with his penis on that morning, he denied doing so. Appellant did confess to anally penetrating Sheila with his penis on two prior occasions, but claimed that Evans had paid him to perform those acts. Toward the end of the approximately three-hour interview, appellant prepared a handwritten statement detailing the events to which he had verbally confessed. Shortly after he completed the written statement, appellant was arrested.

State v. Phillips, 656 N.E.2d 643, 650-652 (Ohio 1995).

During trial, three medical experts testified for the State.  All three agreed that the cause of Evans's death was by a fatal injury to her duodenum (a portion of her intestine) on or about January 16, 1993.  The Summit County Coroner, Dr. William Cox was the only medical expert to testify that Evans was raped on the day of her death.[3]  At the mitigation hearing, six witnesses testified for Phillips: (1) Hazel Phillips (his grandmother); (2) Williams David Phillips, Jr. (his older brother); (3) William David Phillips, Sr. (his father); (4) Donna Phillips (his mother);  (5) Lonnie Bell (a neighbor); and, (6) Dr. James L. Brown (a psychologist).  Phillips also made an unsworn statement.  Other relevant facts will be set forth when necessary during the Court's discussion of Phillips's individual claims for relief.

---

[3]     Dr. Eugene Iszak, the emergency room physician who first examined Evans, testified that she was not raped "within a few hours" of her death.  (Doc. No. 40, at 729).  Dr. Robert Klein, the pediatric surgeon who operated on Evans, did not form a conclusion as to when she had been anally penetrated.

### III. FEDERAL HABEAS PROCEEDING

On May 13, 2003, Phillips filed a notice of intent to file a petition for a writ of habeas corpus, a motion for appointment of counsel, and a motion to proceed in forma pauperis.  The Court granted the latter two motions and appointed attorneys from the Office of the Ohio Public Defender as lead counsel and Timothy F. Sweeney as co-counsel for Phillips.

Phillips filed a petition on June 9, 2003, filing a motion for stay of execution two days later.  The Court granted a stay of execution on July 17, 2003.  The Respondent filed a return of writ on August 11, 2003, to which Phillips filed a traverse on September 25, 2003.  Thereafter, the Respondent filed a sur-reply.

On June 11, 2003, Phillips filed a notice and identification of items to be included in the federal habeas record.  He also filed motions to expand the record, for discovery, and for an evidentiary hearing.  The Respondent filed opposition to all three motions.  Counsel for both parties also filed a joint motion to expand the record and for a writ of certiorari ordering the transfer of state court records to this Court.

After granting the joint motion, the Court issued an order on January 26, 2004, granting in part and denying in part the opposed motions.  Specifically, the Court granted the motion to expand the record, it granted in part and denied in part the motion for discovery and expert assistance, and granted in part the motion for an evidentiary hearing.  The Court reserved ruling on the scope of the evidence and the issues on which it would hold a hearing until after Phillips's counsel filed a renewed motion.  Phillips filed two further motions to expand the record, which the Court granted with the proviso that it would reserve the right to exclude the documents

entered into the record from consideration if Phillips did not meet the standard set forth in 28

U.S.C. § 2254(e)(2), or if he did not prove that the documents are relevant to the disposition of

the petition.  The Court also ruled that Phillips did not waive the attorney-client privilege or the

work product doctrine as to statements contained in redacted portions of documents he wished to

include in the record.

Phillips requested a hearing on the claims raised in the petition pertaining to ineffective

assistance of counsel during mitigation and sufficiency of evidence based on Dr. Cox's

testimony.  The Court held the evidentiary hearing on June 1 and 2, 2004, focusing on these

issues as described below.

At the hearing, habeas counsel argued that Phillips's conviction and death sentence

should be overturned.  First, habeas counsel asserted that trial counsel were ineffective for failing

to sufficiently cross-examine the Summit County Coroner, Dr. William Cox.  Dr. Cox had

testified during trial that, contrary to Phillips's confession to Akron police detectives, he had

penetrated Sheila with his penis on the day of her death, rather than with his finger.  If Phillips's

version of the events were true, habeas counsel argued, then Phillips would be ineligible for the

death penalty under Ohio law.[4]  Counsel concluded that, if the defense team had effectively

---

[4]      Pursuant to Ohio law, a criminal defendant is only eligible for the death penalty
for felony murder if he or she commits a crime while also committing one of
several enumerated felonies.  Ohio Rev. Code § 2929.04(7).  One of the
enumerated felonies is rape, which Ohio defines as, "sexual conduct" with
another.  Ohio Rev. Code § 2907.03.  "Sexual conduct" is defined as "vaginal
intercourse between a male and female, and anal intercourse, fellatio, and
cunnilingus between persons regardless of sex.  Penetration, however slight, is
sufficient to complete vaginal or anal intercourse."  Ohio Rev. Code § 2907.01.
Thus, to constitute rape and be eligible for the death penalty in Ohio, there must
be penetration by a penis.

cross-examined Dr. Cox on this issue, they could have raised sufficient doubt on this issue to

avoid a capital murder conviction.  Moreover, habeas counsel asserted that trial counsel were

ineffective for failing to discover some potentially impeaching evidence against Dr. Cox.  Close

to the time of Phillips's trial, habeas counsel argued, Dr. Cox was terminated from and involved

in litigation with one of his employers, St. Thomas Hospital.  He was hoping to form a new

business in which he would conduct private autopsies to supplement his income.  Habeas counsel

asserted that Dr. Cox learned prior to Phillips's trial that, in order to conduct this new private

business, he would have to receive the approval of the Summit County Prosecutor.  Habeas

counsel argued that, if trial counsel had known this information, they could have used it to

undermine the credibility of Dr. Cox's trial testimony by arguing that Dr. Cox had a motive to

slant his testimony in order to curry favor with the prosecutor.

   In addition to claiming ineffective assistance of counsel regarding Dr. Cox and his

testimony, habeas counsel also asserted that counsel were ineffective during the penalty phase of

the trial.  Habeas counsel claimed that the defense team did not sufficiently investigate Phillips's

background prior to the mitigation hearing.  Had they done so, habeas counsel averred, defense

counsel would have found that Phillips came from a troubled family.  They also asserted that trial

counsel should have, but did not, attempt to explain Phillips's rape and murder of a three-year-

old girl by providing the jury with information regarding Phillip's social and familial history.

   Michael Edminister, one of Phillips's trial counsel, was the first to testify.  He stated that

his primary responsibility was to prepare for the mitigation phase of trial and pre-trial motions

while lead counsel, Kerry O'Brien, predominantly covered the culpability phase.  Edminister

testified that he and O'Brien had discussed the issue of whether Sheila had been raped on the

10

morning of her death. While he recognized that the jury might regard it as "splitting hairs," he stated that, at the time of the trial, he understood that, if the defense could prove that Phillips had not raped Sheila Marie with his penis on the morning of her death but had penetrated her digitally, as he had stated in his confession to police, then the capital specification would no longer apply and Phillips would be spared the death penalty.

To investigate that issue, Edminister recalled that he interviewed Dr. Klein, the emergency room doctor who first examined Sheila, Dr. Izsak, who performed surgery on her, and he attempted to obtain an interview with Dr. Cox. When he and co-counsel were eventually able to secure an interview with Dr. Cox, Edminister remembered that the doctor's opinion regarding when the rape occurred was not as conclusive during their meeting as it was during the trial testimony. Edminister also testified that he was unaware of any litigation between Dr. Cox and his employer, or that Dr. Cox was seeking the advice of the county prosecutor about opening a private autopsy business during the time of Phillips's trial. Both defense counsel stated that they attended portions of the Fae Evans trial and observed Dr. Cox's testimony therein to help prepare for Phillips's trial.

Habeas counsel questioned Edminister extensively regarding his investigation and preparation of the mitigation phase of trial as well as his mitigation strategy. Edminister stated that he interviewed family members, neighbors, and former teachers in an attempt to obtain a complete portrait of his client and the Phillips family. He obtained school records and had lengthy conversations with Phillips regarding mitigation. Edminister testified that he went to the Children's Services Board (hereinafter "CSB") to procure files about the family and discern whether there was a history of abuse or other dysfunction in the family.

11

Edminister spoke extensively about his visit to CSB during his testimony.  He stated that he was not permitted to go alone to the CSB to view its records but was required to go with one of the Summit County prosecutors trying the case.  The CSB lawyer also was present at this meeting.  Edminister revealed that he was not permitted to obtain the records or copies of the records, but could only take notes from them.  He also asserted that both the prosecutor and the CSB lawyer provided him with documents from the files.  When habeas counsel queried Edminister why he did not seek the trial court's permission to get copies of the files, he responded that there was no precedent for this type of request and that, based upon his familiarity with the trial judge and the process as it existed in Summit County, any such attempt would have been futile.  Edminister testified that, based on his interviews with family and friends, as well as his review of the CSB documents, he was unaware of any abuse or allegations of abuse in Phillips's family.

Edminister also testified regarding his mitigation strategy.  He stated that although he expected to discover a plethora of information revealing that Phillips was a psychological predator, every person with whom he spoke described Phillips as a "pleasant kid."  Edminister testified that Phillips also stated that there was no abuse in the family and proffered no explanation for Sheila's death other than his claim that he had "snapped."  When habeas counsel queried Edminister why he could not probe Phillips further and procure some information about familial abuse, he responded that while he attempted to procure this information, he was concerned that if he pressed Phillips any further it would destroy the attorney-client relationship that he fervently was attempting to build.

Edminister emphasized that, to him, it appeared that Phillips had a relatively normal

12

upbringing.  He noted that Phillips was not a truant, that teachers remarked positively about him, and that he lived in a nuclear family with a father who had steady work.  Based on the information he procured from Phillips, his family members, neighbors and teachers, Edminister testified, he decided to present a mitigation strategy in which he would allege that Sheila's death was an anomaly and that Phillips's life should be spared.

Habeas counsel then called trial counsel, Kerry O'Brien to testify.  O'Brien stated that, while he tried to plead out the death penalty, the prosecution rejected the offer.  He then contacted the Ohio Public Defender (hereinafter "OPD") to ascertain whether they could provide the defense with any financial aid in procuring an investigator.  When the OPD responded negatively, O'Brien procured the only private investigator available in the area, Gerry Schultz.  Moreover, he asserted that the trial court provided only minimal funds to obtain an investigator, eventually reducing the amount approved so that defense counsel had to pay the remainder out-of-pocket.  Schultz, O'Brien revealed, was a former police officer who did not procure much valuable information for the defense team.  O'Brien stated that he did not pursue a strategy involving abuse because he was unaware that Phillips had been abused.  He stated that Phillips had denied being abused to him as well as to the defense psychologist, Dr. Brown, whom O'Brien procured to examine Phillips.

Habeas counsel questioned O'Brien regarding his cross-examination of Dr. Cox.  O'Brien described the mood of the courtroom during Dr. Cox's direct examination.  He explained that he and his co-counsel were standing next to the jury when Dr. Cox began his testimony.  Dr. Cox then put up slides which were located directly opposite the jury.  O'Brien revealed that there were audible gasps from the jury when Dr. Cox showed the slides and that the female jurors

began to cry.  O'Brien further explained that Dr. Cox habitually engaged in "run-away

testimony," in which he repeated at length the testimony he provided on direct examination

during cross-examination.  Because he did not want Dr. Cox to repeat this disturbing, though

admittedly highly relevant, testimony, O'Brien explained, he chose not to question Dr. Cox

extensively on cross-examination regarding whether Phillips had raped Sheila with his penis or a

finger on the morning of her death.    O'Brien also depicted two events that occurred during the

trial which undermined his trust in his client and helped frame his trial strategy.  First, O'Brien

testified that, during the State's opening argument, Phillips tapped Edminister on the shoulder

and admitted that the confession police had obtained from him was authentic.  Prior to that time,

Phillips had asserted to his counsel that the confession was a forgery.  Defense counsel had

asserted that the handwriting was not Phillips's, questioning its authenticity.  O'Brien described a

second point at which he believed Phillips had lied to him– after Phillips was convicted but prior

to the mitigation phase of trial– when the defense team learned of an incident that occurred at

the county prison.  He stated that Tim Smith, the inmate services coordinator for the Summit

County Jail told defense counsel that Phillips had threatened another inmate with rape, an act

which clearly undermined any attempt to argue that Phillips's acts vis-a-vis Sheila Evans were an

anomaly or that Phillips was an appropriate candidate for custody.  Smith disclosed to defense

counsel that the prosecution had subpoenaed two witnesses of that altercation.  O'Brien testified

that Phillips had denied that any altercation occurred.

     Habeas counsel's final witness was Dr. Robert Smith.  Dr. Smith examined Phillips twice

during his state post-conviction proceedings and once during the pendency of his federal habeas

litigation.  Dr. Smith testified that the CSB reports documented claims of extensive neglect and

some indication of physical abuse in the Phillips home.  He noted that the reports included incidences of improper sexual contact between Phillips's step-father and the children, although he conceded that there was no specific reference to abuse of Phillips.  Indeed, Dr. Smith acknowledged both that Phillips denied any personal abuse during interviews with him <u>and</u> that the records primarily emphasized contact between Phillips's father and the female step-children living in the home.  Despite this, Dr. Smith surmised that Phillips <u>had</u> <u>been</u> sexually abused.  He opined that, based on Phillips's report of repeated incidences of impotence, his sexual role confusion, and sexual deviance, which are all symptoms of a sexually abused child, Phillips had been sexually abused, despite his denials and the absence of any direct evidence of it.

Dr. Smith diagnosed Phillips with a mixed personality disorder with borderline and paranoid features.  Dr. Smith explained that individuals with borderline personality disorders never develop a sense of identity.  Their reactions are based on a survival instinct and thus, they typically overreact to situations and often misinterpret them.  He further testified that individuals with borderline personality disorder generally will form a very strong relationship with others initially, but have difficulty maintaining long-term relationships because of their mood swings and aggression.  Dr. Smith concluded that this type of relationship existed between Phillips and Fae Evans.  Although Phillips initially "idolized" her, their relationship eventually became rocky as they had disagreements and power struggles.  Seven years older than Phillips, Evans took on a "maternal" role with Phillips, encouraging him to explore sexually.  She encouraged him to have sexual relations with her sister and cousin, and eventually with Sheila with Evans's participation.  Dr. Smith reported that the latter act was a form of their sexual relationship and sexual dysfunction.

15

Dr. Smith opined that Phillips's reaction to Sheila on the day of her murder was consistent with his circumstances.  Based on his parents' history of physical and possibly sexual abuse, as well as observations of Evans's parenting, Phillips's only parenting role models, Dr. Smith surmised that it was not surprising that Phillips responded to Sheila's disobedience with violence.

The Respondent called one witness, Michael Reedy, during the evidentiary hearing. Reedy was the subject of Phillips's threat during the Summit County Jail altercation.  Reedy testified regarding its occurrence as well as about the fact that Phillips had told another inmate that he should have sodomized Reedy after he had fought with him.  The Court then adjourned the hearing, setting briefing schedules for both the § 2254(e) issue and post-hearing briefs.

Habeas counsel submitted a supplemental brief on June 17, 2004, addressing the reasons why Phillips contends the Court may fully consider the documents in the expanded record despite the failure to submit those materials to the state court at any point in time.  The Respondent submitted a brief in opposition.  Both parties also submitted post-hearing briefs.

## IV. SECTION 2254(e)(2)

Pursuant to the Court's oral request during the evidentiary hearing, habeas counsel submitted a brief regarding whether the Court can consider all the documents in the expanded record on June 17, 2004.  The Respondent filed a response brief on July 1, 2004, asserting that some of the documents contained in the expanded record are barred because Phillips lacked diligence in presenting his claims to the state courts as required by 28 U.S.C. § 2254(e)(2).  That statute states:

16

> (e)(2) If the applicant has failed to develop the factual basis of a claim in State
> court proceedings, the court shall not hold a hearing on the claim unless the
> applicant shows that–
>> (A) the claim relies on–
>>> (i) a new rule of constitutional law, made retroactive
>>> to cases on collateral review by the Supreme Court,
>>> that was previously unavailable; or
>>> (ii) a factual predicate that could not have been
>>> previously discovered through the exercise of due
>>> diligence; and
>> (B) the facts underlying the claim would be sufficient to establish
>> by clear and convincing evidence that but for constitutional error,
>> no reasonable factfinder would have found the applicant guilty of
>> the underlying offense.

28 U.S.C. § 2254(e)(2).  Because the statute enunciates the standards by which a habeas court

may grant an <u>evidentiary</u> hearing, it was unsettled whether documents admitted into the habeas

record by way of Habeas Rule 7 were subject to the same standard until the United States

Supreme Court issued its opinion in <u>Holland v. Jackson</u>, 542 U.S. 649 (2004).[5]   The <u>Holland</u>

Court settled this issue by holding that restrictions set forth in § 2254(e)(2) apply when a

petitioner seeks habeas relief based on the introduction of new evidence without an evidentiary

hearing, <u>i.e.</u>, when the petitioner seeks the introduction of new evidence based on Habeas Rule 7.

Since <u>Holland</u>, courts have applied the § 2254(e)(2) standard to motions to expand the record.

<u>See</u>, <u>e.g.</u>, <u>Cooper-Smith v. Palmateer</u>, 397 F.3d 1236 (9th Cir. 2005)(<i>following</i> <u>Holland</u> and

applying § 2254(e)(2) standard to motion to expand the record); <u>Quinlan v. Blades</u>, No. CV 04-

02240S-MHW, 2006 WL 2228966 (D. Idaho Aug. 3, 2006)(same); <u>Poyson v. Schriro</u>, No. CV

---

[5]     The Supreme Court issued the <u>Holland</u> opinion on June 28, 2004, in the time
between Phillips's filing of his brief on this issue and the Respondent's response
brief.  Thus, the section of Phillips's brief which he devotes to asserting that the
standard for expanding the record differs from that of an evidentiary hearing was
rendered moot.

04-0534-PHX-NVW, 2006 WL 2091694 (D. Ariz. July 24, 2006)(same).

Before applying the § 2254(e)(2) standard to the documents in the expanded record, however, the Court observes that the Respondent concedes in her response brief that Phillips has met this standard for many of the documents he submitted.  Based on this concession and both parties' representations of when Phillips presented the claims supported by the expanded record and his diligence in obtaining these documents, the Court sees no reason why it must undertake a separate analysis regarding their admissibility here.[6]  Thus, for the reasons stated in the parties' briefs, the Court finds that Tabs 1, 2, 7, and 8 satisfy the requirements set forth in § 2254(e)(2).  The Court will consider these documents when reviewing the grounds for relief for which they are offered in support.

The remaining documents, Tabs 3-6 and 9-14, the Respondent asserts are barred by § 2254(e)(2).  These documents support Phillips's assertion that trial counsel were ineffective for failing to cross-examine Dr. Cox based on his alleged bias favoring the Summit County Prosecutor's office for financial reasons.  The Respondent maintains that Phillips did not develop the factual basis for this claim in state court.  While Phillips asserted claims of ineffective assistance of trial counsel regarding the cross-examination of Dr. Cox to the state courts, he did not assert an ineffective assistance claim based on counsel's failure to cross-examine Dr. Cox on this particular theory and/or their failure to uncover the grounds for doing so.  Accordingly, Phillips may not satisfy the requirements of § 2254(e)(2) unless he demonstrates that the claim relies on a new, retroactive rule of constitutional law or that the factual predicate could not have

---

[6]     Specifically, Tab 1 of the expanded record pertains to Phillips's tenth ground for relief and Tabs 2, 7, and 8 pertain to Phillips's sixth ground for relief.

been discovered previously through the exercise of due diligence under § 2254(e)(2)(A)(i) and

(ii).  Additionally, Phillips must show that the facts underlying the claim would be sufficient to

establish by clear and convincing evidence that, but for constitutional error, no reasonable

factfinder would have found him guilty of the rape and murder of Sheila Evans under §

2254(e)(2)(B).

Phillips clearly cannot meet these requirements.  Because there is no new, retroactive rule

of law from the Supreme Court made applicable to him, Phillips does not meet the requirement

of § 2254(e)(2)(A)(i).  Thus, he must demonstrate that he was diligent in developing this claim in

state court but was prevented from doing so.  Phillips has not made this showing.  He fails to

provide the Court with details regarding his efforts to present this claim or any documents

attendant thereto in state court.  Phillips asserts that the State should have provided him with the

Ohio Medical Board documents and that its failure to do so satisfies the due diligence

requirement of § 2254(e)(2)(A)(ii).[7]

Even if Phillips could prove that the State had an obligation to turn these documents over

to him, which the Court expressly does not so find, Phillips would not be entitled to submit them

for this Court's review because he cannot fulfill the requirements of § 2254(e)(2)(B).  Pursuant to

that section of the statute, Phillips must prove that no reasonable factfinder would have found

him guilty of rape and murder if these materials had been available to counsel.  Given Phillips's

confessions and the extensive medical evidence adduced during trial, the Court finds that a

---

[7]     Interestingly, Phillips asserts in the petition that trial counsel were ineffective for
failing to procure these documents (which he asserts were publicly available) but,
in an attempt to obtain this Court's review of them, argues that the State was at
fault for his failure to present these claims to the state courts because it did not
provide defense counsel with these documents.

reasonable factfinder could (and, indeed, likely would) have found him guilty, whether or not Dr.

Cox's credibility had been impeached with the evidence Phillips now tenders.  The evidence of

the alleged bias to which habeas counsel now points is simply not that powerful when weighed

against Dr. Cox's substantial medical credentials and the extensive objective support offered to

endorse his conclusions.  It is highly unlikely that any reasonable fact finder would have been

swayed by the accusations of bias Phillips asserts should have been made.  Thus, because Phillips

does not meet the requirements of § 2254(e)(2), the Court will not consider the tabbed items 3-6

and 9-14 of the expanded record when reviewing the pertinent claims for relief raised in the

petition.


## V. GROUNDS FOR RELIEF

In his petition, Phillips asserts twenty-five (25) grounds for relief:

1.    Mr. Phillips's conviction for aggravated murder while committing a rape is
      unconstitutional because the evidence was insufficient to prove the offense, and
      because the State's arguments and the trial court's instructions unfairly confused
      the jurors about the requisite connection between the alleged rape and murder.

2.    Mr. Phillips was denied due process because he was convicted of aggravated
      murder without proof beyond a reasonable doubt that he specifically intended to
      kill Sheila on the day she died.

3.    Mr. Phillips's conviction of the rape which supported the single aggravating
      circumstance rendering him death-eligible was a denial of due process, because
      the State did not prove beyond a reasonable doubt that Mr. Phillips raped Sheila
      on the day she died.

4.    Mr. Phillips was denied due process because he was convicted of murdering
      Sheila on January 18, 1993 when the State had already argued and proved in his
      co-defendant's trial that Sheila's death was caused on January 16, 1993.

5.    Mr. Phillips was denied due process, a fair trial, a reliable penalty determination,
      and an impartial jury because inflammatory statements by a grand juror tainted

20

several of his jurors.

6.    Mr. Phillips was denied the effective assistance of counsel.

7.    Mr. Phillips was denied his constitutional rights to due process, equal protection, and a fair trial because the trial court applied the wrong standard in permitting the introduction of dozens of prejudicial photographs and slides.

8.    Mr. Phillips was denied his constitutional rights to due process and a fair trial because gruesome, cumulative images were admitted into evidence even though their prejudicial effect outweighed their probative value.

9.    Prosecutorial misconduct denied Mr. Phillips a fair trial and due process of law.

10.   Mr. Phillips was denied a fair trial, the assistance of counsel, due process and the right to be present, because the court failed to involve the defense when the jury asked two questions during deliberations.

11.   Mr. Phillips was denied his confrontation and due process rights when he was denied an arraignment in open court.

12.   Mr. Phillips was denied his rights to due process and to confront his accusers because the State was allowed to use a videotaped deposition without a finding that the witness was unavailable.

13.   The State used Mr. Phillips's involuntary confession as evidence against him.

14.   Mr. Phillips was denied due process and a fair trial because the trial court's instructions on purpose to kill, cause of death, the relevance of mitigating factors, and the jury's responsibility for the death verdict were erroneous and misleading.

15.   The mitigating factors defined by Ohio law and used at Mr. Phillips's trial are unconstitutional because they are misleading and create a substantial risk of unreliable death sentences.

16.   The statutory definition of reasonable doubt used at Mr. Phillips's mitigation hearing deprived him of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

17.   Mr. Phillips was denied an impartial jury and due process because the trial court denied him individual sequestered voir dire.

18.   Mr. Phillips's death sentence is unconstitutional because the aggravating specification merely duplicated an element of felony murder.

19.     Ohio's death penalty scheme is unconstitutional facially and as applied.

20.     Mr. Phillips's death sentence is unfairly disproportionate to similar cases, including that of his co-defendant.  The Ohio courts denied him due process by [failing] to properly consider the proportionality of his death sentence.

21.     Mr. Phillips's death sentence is unconstitutional because it is not reliable and because his mitigating factors outweigh the aggravating circumstances.

22.     Mr. Phillips was denied due process because both the trial court and the court of appeals failed to fulfill their statutory duties in imposing and reviewing his sentence of death.

23.     Mr. Phillips was denied his right to the effective assistance of appellate counsel because counsel failed to present a complete record and failed to raise all reversible errors.

24.     Ohio's post-conviction procedures neither afford an adequate corrective process nor comply with due process and equal protection under the Fourteenth Amendment.

25.     Mr. Phillips's conviction and sentence are unconstitutional because of the cumulative effect of the many errors that occurred during his trial and in all subsequent proceedings.


**VI. THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT ("AEDPA")**

The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996.  In Lindh v. Murphy, 521 U.S. 320, 322-322, 336 (1997), the United States Supreme Court held that the provisions of the AEDPA apply to habeas corpus petitions filed after that effective date.  See also Woodford v. Garceau, 538 U.S. 202, 210 (2003); Barker v. Yukins, 199 F.3d 867, 871 (6th Cir. 1999)("It is now well settled that AEDPA applies to all habeas petitions filed on or after its April 24, 1996 effective date.").  Because Phillips's initial petition was filed on June 9, 2003, the AEDPA governs this Court's consideration of his petition.

22

The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" Woodford, 538 U.S. at 206 (*citing* Williams v. Taylor, 529 U.S. 362, 436 (2000)). In advancing such goals, Section 2254(d) places new constraints on "the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." Williams, 529 U.S. at 412.  Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This legal standard establishes a multi-faceted analysis involving a consideration of both the state court's statement and/or application of federal law and its finding of facts.

With respect to Section 2254(d)(1), "clearly established federal law" refers to the holdings, as opposed to dicta, of the United States Supreme Court's decisions as of the time of the relevant state-court decision.  Williams, 529 U.S. at 412; Barnes v. Elo, 231 F.3d 1025, 1028 (6th Cir. 2000).[8]  The "contrary to" and "unreasonable application" clauses of the Section

---

[8]     Although only Supreme Court case law is relevant under the AEDPA in examining what federal law is "clearly established," Circuit Courts of Appeals' decisions "may be informative to the extent [they] have already reviewed and

2254(d)(1) are independent tests and must be analyzed separately.  <u>Williams</u>, 529 U.S. at 412-13; <u>Hill</u>, 337 F.3d at 711.  A state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  <u>Williams</u>, 529 U.S. at 412-13.

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case."  <u>Williams</u>, 529 U.S. at 413.  A state-court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  <u>Id.</u> at 407; <u>Hill</u>, 337 F.3d at 711.  In order for a state court's application of clearly established federal law to be unreasonable, the state court's decision must be more than incorrect or erroneous, rather it must be objectively unreasonable.  <u>Wiggins v. Smith</u>, 539 U.S. 510, 520-21 (2003); <u>Williams</u>, 529 U.S. at 411; <u>Simpson v. Jones</u>, 238 F.3d 399, 405 (6th Cir. 2000).  The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004).  While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case.  <u>Id.</u>

As to the "unreasonable determination of the facts" clause in Section 2254(d)(2), the

_____

interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court."  <u>Hill v. Hofbauer</u>, 337 F.3d 706, 716 (6th Cir. 2003).

24

Supreme Court applied that section of 2254(d)(2) in <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003).  In

that case, the Court noted that a "clear factual error" such as making factual findings regarding

the contents of social service records contrary to "clear and convincing evidence" presented by

the defendant constitutes an "unreasonable determination of the facts in light of the evidence

presented."  <u>Id.</u> at 528-29.  In other words, a state court's determination of facts is unreasonable

if its findings conflict with clear and convincing evidence to the contrary.  This analysis mirrors

the "presumption of correctness" afforded factual determinations made by a state court which can

only be overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); <u>see</u> <u>also</u> <u>Mitchell v.</u>

<u>Mason</u>, 325 F.3d 732, 737-38 (6th Cir. 2003); <u>Clark v. O'Dea</u>, 257 F.3d 498, 506 (6th Cir.

2001)("regardless of whether we would reach a different conclusion were we reviewing the case

de novo, the findings of the state court must be upheld unless there is clear and convincing

evidence to the contrary").[9]  This presumption only applies to basic, primary facts, and not to

mixed questions of law and fact.  <u>Mitchell</u>, 325 F.3d at 737-38 (ineffective assistance of counsel

is mixed question of law and fact to which the unreasonable application prong of Section

2254(d)(1) applies).

By its express terms, however, Section 2254(d)'s constrained standard of review only

applies to claims that were adjudicated on the merits in the state court proceeding.  <u>Clinkscale v.</u>

---

[9]     Factual determinations made by a state appellate court after a review of the trial
court record constitute a "hearing" where the parties were formally before the
court, the petitioner was given an opportunity to be heard, and the petitioner's
claim received plenary consideration.  <u>Clark</u>, 257 F.3d at 546.  <u>See</u> <u>also</u> <u>Mitchell</u>
<u>v. Rees</u>, 114 F.3d 571, 576 (6th Cir. 1997).  Consequently, the deference to state
court factual determinations required by § 2254 applies to the factual
determinations of both trial and appellate courts.  <u>Clark</u>, 257 F.3d at 546-547.

Carter, 375 F.3d 430, 436 (6th Cir. 2004).  When a state court does not assess the merits of a

petitioner's habeas claim, the deference due under the AEDPA does not apply.  Id.; Newton v.

Million, 349 F.3d 873, 878 (6th Cir. 2003); Maples v. Stegall, 340 F.3d 433, 436-37 (6th Cir.

2003).[10]  In such a case, the habeas court is not limited to deciding whether that court's decision

was contrary to or involved an unreasonable application of clearly established federal law, but

rather conducts a *de novo* review of the claim.  Maples, 340 F.3d at 436-37; Benge v. Johnson,

312 F. Supp. 2d 978, 987 (S.D. Ohio 2004).[11]  If the state court conducts a harmless error

analysis but does not indicate whether its finding is based on state or federal constitutional law,

however, a habeas court, while conducting an independent review of the facts and applicable law,

must nonetheless determine "whether the state court result is contrary to or unreasonably applies

clearly established federal law."  Maldonado v. Wilson, 416 F.3d 470, 476 (6th Cir. 2005)(*citing*

Harris v. Stovall, 212 F.3d 940, 943 (6th Cir. 2000)).


**VII.    PROCEDURAL DEFAULT**

In general, a federal court may not consider "contentions of general law which are not

---

[10]      Prior to Maples, the Sixth Circuit had applied the AEDPA standard of review to
claims which had not been explicitly mentioned or analyzed by the state courts.
See e.g., Clifford v. Chandler, 333 F.3d 724, 730 (6th Cir. 2003); Doan v.
Brigano, 237 F.3d 722, 727 (6th Cir. 2001).  However, in Maples, the Sixth
Circuit found that Doan and Clifford had been abrogated by the United States
Supreme Court's decision in Wiggins v. Smith, 539 U.S. 510, 534-38 (2003).
Maples, 340 F.3d at 437.

[11]      To the extent that the state court did not address a claim due to petitioner's failure
to raise it on direct review, the claim may have been procedurally defaulted.
O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999); Maples v. Stegall, 340 F.3d
433, 437-38 (6th Cir. 2003).

resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." Wainwright v. Sykes, 433 U.S. 72, 87 (1977).  If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991).  To be independent, a state procedural rule and the state courts' application of it "must rely in no part on federal law." Fautenberry v. Mitchell, No. C-1-00-332, 2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26, 2001)(citing Coleman, 501 U.S. at 732-733).  To be adequate, a state procedural rule must be "firmly established and regularly followed" by the state courts at the time it was applied.  Ford v. Georgia, 498 U.S. 411, 423-24 (1991); Williams v. Coyle, 260 F.3d 684, 693 (6th Cir. 2001).  If a petitioner fails to fairly present any federal habeas claims to the state courts but has no remaining state remedies, then the petitioner has procedurally defaulted those claims. O'Sullivan, 526 U.S. at 848; Rust v. Zent, 17 F.3d at 160.

In Maupin v. Smith, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now familiar test to be followed when the State argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule.  Second, the federal court must determine whether the state courts actually enforced the state procedural sanction -- that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions

27

> in the affirmative, it would not review the petitioner's procedurally defaulted
> claim unless the petitioner can show cause for not following the procedural rule
> and that failure to review the claim would result in prejudice or a miscarriage of
> justice.

Williams v. Coyle, 260 F.3d 684, 693 (6th Cir. 2001)(*citing* Maupin, 785 F.2d at 138)(further

citations omitted).

In determining whether the Maupin factors are met, the federal court looks to the last

explained state court judgment. Ylst v. Nunnemaker, 501 U.S. 797, 805 (1991);  Combs v.

Coyle, 205 F.3d 269, 275 (6th Cir. 2000).  If the last reasoned opinion on a claim explicitly

imposed a procedural default, there is a presumption, which can be rebutted with strong evidence

to the contrary, "that a later decision rejecting the claim did not silently disregard the bar and

consider the merits."  Ylst, 501 U.S. at 803.  "If the last state court to be presented with a

particular federal claim reaches the merits, it removes any bar to federal-court review."  Id. at

801.

If the three Maupin factors are met, the claim is procedurally defaulted.  However, the

federal court may excuse the default and consider the claim on the merits if the petitioner

demonstrates that (1) there was cause for him to not follow the procedural rule and that he was

actually prejudiced by the alleged constitutional error or (2) a fundamental miscarriage of justice

would result from a bar on federal review.  Maupin, 785 F.2d at 138; Hutchison v. Bell, 303 F.3d

720, 735 (6th Cir. 2002); Combs, 205 F.3d at 274-275.

A petitioner can establish cause in two ways.  First, a petitioner may "show that some

objective factor external to the defense impeded counsel's efforts to comply with the State's

procedural rule."  Murray v. Carrier, 477 U.S. 478, 488 (1986); Mohn v. Bock, 208 F. Supp.2d

796, 801 (E.D. Mich. 2002).  Objective impediments include an unavailable claim or interference

28

by officials that made compliance impracticable.  <u>Murray</u>, 477 U.S. at 488; <u>Mohn</u>, 208 F. Supp.2d at 801.  Second, constitutionally ineffective assistance of counsel constitutes cause. <u>Murray</u>, 477 U.S. at 488-489; <u>Rust v. Zent</u>, 17 F.3d 155, 161 (6th Cir. 1994); <u>Mohn</u>, 208 F. Supp.2d at 801, 804.

If a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself be presented to the state courts as an independent claim before it may be used to establish cause.  <u>Murray v. Carrier</u>, 477 U.S. 478, 488-489 (1986).  If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim.  <u>Edwards v. Carpenter</u>, 529 U.S. 446, 452-53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage."  <u>Perkins v. LeCureux</u>, 58 F.3d 214, 219 (6th Cir. 1995)(<i>quoting</i> <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982)).  "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice."  <u>Simpson v. Jones</u>, 238 F.3d 399, 409 (6th Cir. 2000).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense.  <u>Dretke v. Haley</u>, 541 U.S. 386, 392 (2004)(<i>citing</i> <u>Murray v. Carrier</u>, 477 U.S. 478, 495-96 (1985)).  When the Supreme Court extended this exception to claims of capital sentencing error, it limited the exception in the

29

capital sentencing context to cases in which the petitioner could show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" Id. (*quoting* Sawyer v. Whitley, 505 U.S. 333, 336 (1992)).

While Phillips counters the assertions of the Respondent that some of his claims are procedurally defaulted, he does not generally address these assertions in the traverse.  Instead, Phillips defends each assertion of procedural default when he addresses each individual ground for relief.  The Court will likewise address claims of procedural default when it reviews Phillips's individual claims.

## VIII. INDIVIDUAL GROUNDS FOR RELIEF

### A. First, Second, and Third Grounds for Relief

In these grounds, Phillips argues that the evidence the State adduced during his trial was insufficient in some manner.  Although the Court will review each ground for relief individually, it notes here that in Jackson v. Virginia, 443 U.S. 307 (1979), the United States Supreme Court explained the standard of review a habeas court must employ when reviewing an insufficiency of the evidence claim.  It concluded that the habeas court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319; Biros v. Bagley, 422 F.3d 379, 392 (6th Cir. 2005).  In applying Jackson, this Court must limit itself to evidence adduced during trial because a "sufficiency of the evidence review authorized by

30

Jackson is limited to 'record evidence.'  Jackson does not extend to non-record evidence,

including newly discovered evidence."  Herrera v. Collins, 506 U.S. 390, 402 (1993)(citing

Jackson, 443 U.S. at 318).  The Jackson standard does apply, however, "whether the evidence of

guilt was direct or circumstantial."  Scott v. Elo, 302 F.3d 598, 602 (6th Cir. 2002), cert. denied,

537 U.S. 1192 (2003)(citing Spalla v. Foltz, 788 F.2d 400, 402 (6th Cir. 1986)).

### 1. First Ground for Relief

Phillips asserts that the evidence presented during trial was insufficient to convict him of

aggravated murder because the State did not prove that Sheila Evans was killed while she was

being raped as is required by Ohio law.[12]  He also claims that the manner in which the State

argued and the trial court instructed the jury confused it about the required connection between

the rape and murder.  The Respondent concedes that Phillips properly raised this issue on direct

appeal to the Ohio Supreme Court.  Thus, the court will address the merits of the claim.

When reviewing this claim on direct appeal, the Ohio Supreme Court found it to be

without merit.  It stated:

> In his third and fifth propositions of law, appellant claims that the state introduced
> insufficient evidence to lead to a conviction. When a reviewing court examines
> the sufficiency of the evidence offered to support a criminal conviction, that
> court's function "is to examine the evidence admitted at trial to determine whether
> such evidence, if believed, would convince the average mind of the defendant's
> guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the
> evidence in a light most favorable to the prosecution, any rational trier of fact
> could have found the essential elements of the crime proven beyond a reasonable
> doubt." State v. Jenks (1991), 574 N.E.2d 492, paragraph two of the syllabus.

---

[12]     Pursuant to Ohio Revised Code § 2903.01(B), aggravated murder is defined as
purposely causing the death of another "while committing or attempting to
commit . . . kidnapping, rape, aggravated arson, or arson, aggravated robbery or
robbery, aggravated burglary or burglary, or escape."  Ohio Rev. Code §
2903.01(B).

31

In his third proposition, appellant contends that the state failed to prove that Sheila was killed while being raped as is required by R.C. 2903.01(B) in order to obtain a conviction for aggravated murder. Appellant argues that Sheila's death was caused solely by the intestinal injury inflicted on January 16, 1993, and thus, even if appellant did rape Sheila on January 18, he could not have killed her while raping her because the lethal injury had been inflicted two days earlier. The intestinal injury certainly contributed to Sheila's death, and according to Dr. Klein's testimony would have led to her death by itself if it had remained untreated. Appellant, however, brushes over the additional statements made by Dr. Cox which clearly indicate that Sheila died also as a result of the severe beating she sustained on January 18. Dr. Cox testified that the beating Sheila suffered on the morning of her death caused her intestine to rupture, which, along with numerous associated complications, led to her death. Appellant was the only adult male present in the apartment on January 18 before the paramedics arrived. He admitted that he had become sexually aroused during the beating so that he "thought about doing [Sheila] * * * in the butt." The evidence presented by the state clearly supports a finding beyond a reasonable doubt that appellant raped and severely beat Sheila on the morning of January 18, 1993, as one continuous occurrence, and that the beating directly led to Sheila's death. Appellant's third proposition is overruled.

State v. Phillips, 656 N.E.2d 643, 655-56 (Ohio 1995)(parallel citation omitted).

Although the Ohio Supreme Court did not cite to Jackson in its opinion, it did cite to the state law analogue, State v. Jenks, 574 N.E.2d 492 (Ohio 1991).[13]  More importantly, it did not apply the Jackson precedent unreasonably.  Although the Ohio Supreme Court observed that Dr. Klein testified that Sheila would have died eventually because of the injury to her intestine, it credited  Dr. Cox's testimony in support of its conclusion that a rational factfinder could have determined that Phillips's fatal beating of her on January 18 complicated her injuries and hastened her death.  Additionally, the court found that Dr. Cox's testimony that Sheila was raped on the 18th, when coupled with Phillips's own admission to having been sexually aroused during

---

[13]    The United States Supreme Court has held that a state court need not cite to Supreme Court precedent so long as it does not apply that precedent in an unreasonable fashion.  Early v. Packer, 537 U.S. 3, 8 (2003).

32

the act of beating her, would support the conclusion by a rational fact finder that Sheila was raped and beaten on the same morning.

In reviewing Dr. Cox's testimony, the Court finds that this conclusion is not an unreasonable one.  During his testimony, Dr. Cox thoroughly reviewed the internal and external contusions and hemorrhaging he found throughout Sheila's body and concluded that her immediate cause of death was a homicide caused by "multiple blows accompanied by anal penetration."  (Doc. No. 40, at 728).  Combining this testimony with Phillips's admissions and the other circumstantial evidence of sexual contact, and taking it all in a light most favorable to the State, a rational juror certainly could conclude that Sheila died because Phillips both beat and anally raped her on the morning of her death.  Accordingly, this ground for relief is not well-taken.[14]

### 2. Second Ground for Relief

Phillips asserts that there was insufficient evidence for the jury to find that he intended to kill Sheila Evans.  He argues that the trial testimony revealed that he hit Sheila only after losing his temper.  Once he realized her condition, Phillips maintains, he attempted to revive her.  He also contends that because most of her injuries were to "non-vital" areas of her body, there is insufficient evidence demonstrating that he intended to kill Sheila Evans.  Phillips raised this claim on direct appeal to the Ohio Supreme Court, which rejected it on the merits.  It held that the prosecution had demonstrated sufficient evidence of Phillips's intent to kill to support the jury's conviction:

---

[14]    As stated above, Phillips also asserts that the State and trial court confused the jury regarding this issue.  The Court will address these arguments when it reviews Phillips's ninth and fourteenth grounds for relief, infra.

In his fifth proposition of law, appellant claims that the state offered insufficient proof of a specific intent to kill. The evidence, contends appellant, demonstrates that he "only intended to cause harm, or he was so angry that he had no intent at all." In support of this assertion, appellant focuses on three facts. First, appellant points to his written confession where he admitted that he "just lost it"--i.e., his temper-- on the morning of January 18, 1993. Second, appellant emphasizes that he attempted to save Sheila's life by giving her cardiopulmonary resuscitation. Finally, appellant draws attention to the fact that most of Sheila's bruises were inflicted to "nonvital areas" such as her arms, legs and buttocks.

Appellant's arguments are unpersuasive. Sudden rage does not negate a purpose to kill. See, generally, State v. Rhodes (1992), 590 N.E.2d 261. While appellant did attempt to resuscitate Sheila, that attempt came more than an hour after the beating. The issue is what appellant intended to do at the time he committed the fatal acts, not whether he later changed his mind. Cf. State v. Campbell (1994), 630 N.E.2d 339, 349-350. Finally, even though many of appellant's blows fell on nonvital areas, appellant also struck Sheila's head, certainly a vital area.

The severe, protracted nature of the beating also indicates a purpose to kill. Sheila's body was covered with acute bruises. Appellant stated in his written confession, "I flip[p]ed out and I beat up Shiela [sic ], by fist, stomach, (hit in stomach). A lot, hit hard, when hitting her I hit all over her body, and also threw her around * * *." Dr. Cox noted evidence of "multiple blunt force traumatic injuries to the head." Multiple blows to the abdomen inflicted sufficient force to rupture Sheila's previously injured duodenum, to lacerate her liver, and to make her bleed internally. A blunt force traumatic injury to Sheila's chest bruised internal organs and caused them to bleed. The use of such substantial force by an adult on a three-year-old victim is certainly sufficient evidence from which a jury could reasonably find a purpose to kill.

State v. Phillips, 656 N.E.2d at 656.

The Ohio Supreme Court cogently analyzed the evidence presented during trial.  First, it

refuted Phillips's assertion that he did not intend to kill Sheila Evans because, in Ohio, a sudden

rage does not negate an intent to kill.  It then noted that Phillips's attempt to revive Sheila came

well after he beat her, rendering that fact irrelevant to the jury's decision regarding his intentions

at the time of the beating.  Finally, it found that, contrary to Phillips's assertions, he did beat her

in vital areas of her body and, by his own admission, hit her all over her body and threw her.  The

Ohio Supreme Court held that the fact that these injuries were inflicted on a three-year-old by a

fully grown man was sufficient evidence from which a rational factfinder could conclude that

Phillips intended to kill Sheila Evans.

This Court finds the Ohio Supreme Court's decision to deny this claim to be a reasonable

one.  In denying this ground for relief, the court focused on several important aspects of Dr.

Cox's testimony, including the quantity and locations of the bruises on Sheila's body.  Moreover,

it observed that Phillips admitted beating her repeatedly on multiple parts of her body and to

throwing her.  Pursuant to the standard set forth in Jackson, the Ohio Supreme Court was not

unreasonable in holding that these facts could lead a rational factfinder to find that Phillilps

intended to kill Sheila.

### 3. Third Ground for Relief

In this ground for relief, Phillips asserts that there was insufficient evidence that Sheila

Evans was raped on the day of her death.[15]  As he observed during the evidentiary hearing, the

State's failure to sufficiently prove that a rape occurred on the date of Sheila's death would have

rendered him ineligible for the death penalty under Ohio law, regardless of the jury's conclusion

concerning his role in causing Sheila's death.  He notes that Dr. Cox was the only medical expert

the State produced who concluded both that Sheila was raped with a penis, rather than a finger,

and that she was raped on the morning of her death.  Dr. Iszak, he claims, reached a different

conclusion than that of Dr. Cox.

---

[15]     This ground is somewhat repetitive of points raised in Phillips's first ground for
relief.  While the first ground focuses on the timing of the death-producing
injuries and the connection between those injuries and any rape of Sheila, this
ground focuses solely on the question of whether there was sufficient evidence to
conclude that a rape even occurred on January 18.

When addressing this claim on the merits on direct appeal, the Ohio Supreme Court held

that:

> [T]here was sufficient testimony by Dr. Cox from which a jury could reasonably
> find that a rape had occurred during the course of the killing. Appellant argues
> that Dr. Cox's testimony that Sheila had been anally penetrated on the morning of
> January 18 was controverted by that of Dr. Izsak. Dr. Izsak noted findings that the
> girl had been anally penetrated, but he could not specify whether penetration had
> occurred on the day of her death. These two positions are not inconsistent. Dr.
> Izsak, as one of the emergency room physicians at Children's Hospital, did not
> perform the kind of intense examination that the coroner conducted. Even if the
> two opinions were discordant, that would create a credibility issue for the jury to
> resolve, not this court. Appellant's fifth proposition is overruled.

State v. Phillips, 656 N.E.2d at 656-57.

The Court finds that this decision is not an unreasonable application of Jackson. While

Phillips asserted throughout his briefs and during the evidentiary hearing that Dr. Cox's

testimony contradicted that of the other medical experts, the Ohio Supreme Court correctly notes

that other experts, such as Dr. Iszak, did not form an opinion regarding when the rape occurred.[16]

Thus, Dr. Cox's testimony, as the Ohio Supreme Court opined, was not inconsistent with Dr.

Iszak's testimony.  Moreover, it noted that Dr. Cox's examination of Sheila during the autopsy

was more extensive than Dr. Iszak's, which occurred during her initial emergency room visit.  By

---

[16]    Dr. Iszak's testimony regarding the time of the rape was as follows:
>    Q:    So you - - your testimony is that there had been anal
>          penetration?
>    A:    That's correct.
>    Q:    But based upon your examination, you could not isolate the
>          time frame within which that penetration was
>          accomplished; is that correct?
>    A:    Not within a few hours or anything of that nature.  It
>          appeared it was - - it was a stretched anus with some acute
>          changes, some new changes but to tell you exactly when it
>          occurred and how many times it occurred, I could not.
(Doc. No. 41, at 869).

accepting Dr. Cox's testimony, again in connection with Philips's own admissions (to having

raped Sheila on prior occasions and to having been sexually aroused on that one), a rational

factfinder could determine that Phillips raped Sheila Evans on the morning he murdered her.

Phillips's third ground for relief is not well-taken.[17]

### B. Fourth Ground for Relief

Phillips's fourth ground for relief is that the State inconsistently argued in the Fae Evans

trial that Sheila Evans died from injuries inflicted on January 16, 1993, but asserted in his trial

that Sheila died after the rape and beating Phillips committed on January 18, 1993.  Phillips

further argues that the State should have been collaterally estopped from arguing that Sheila died

as a result of the January 18 beating and rape because the trial court previously had decided that

she died from injuries she received two days before.[18]  He also asserts that trial counsel were

ineffective for failing to raise this issue to the trial court.

On direct appeal, the Ohio Supreme Court held that this claim was barred because

Phillips failed to raise it to the court of appeals.  It then reviewed the claim for plain error.  At the

---

[17]     The Court notes that Phillilps raises the issue of Dr. Cox's bias because of
pending litigation in his Traverse.  This is disfavored.  See Tyler v. Mitchell, 416
F.3d 500, 504 (6th Cir. 2005)("Because the penalty-phase insufficiency argument
was first presented in Tyler's traverse rather than in his habeas petition, it was not
properly before the district court, and the district court did not err in declining to
address it.")(citations omitted).  Moreover, as the Court held above, it will not
review any of the expanded record evidence regarding Dr. Cox's bias based on
financial motives because Phillips fails to meet the standard set forth in §
2254(e)(2).  Accordingly, it must find that Phillips cannot establish that Dr. Cox's
testimony  was tainted based on alleged false testimony that he provided in other
cases or because of his financial interests.

[18]     Judge Williams presided over both trials.  See State v. Evans, 637 N.E.2d 969
(Ohio Ct. App. 1994).

37

conclusion of its plain error analysis, the court observed that the record from the Fae Evans trial

was not before it and that Phillips had neither summarized the findings from the trial nor asked

the court to take judicial notice of those findings during his own proceeding.  Although Phillips

attached the Evans trial transcripts as an appendix to his Ohio Supreme Court brief, the court

would not consider those documents because "[a] reviewing court cannot add matter to the

record before it, which was not a part of the trial court's proceedings, and then decide the appeal

on the basis of new matter."  Phillips, 656 N.E.2d at 643 (citation omitted).  In other words,

because Phillips had not sought to inject the Fae Evans proceedings into his own record before

the trial court, he could not expand the record to do so after-the-fact.

Phillips then raised this issue in his petition for post-conviction relief.  On appeal from

the post-conviction court's denial of relief, the Ninth District Court of Appeals found the claim

to be barred by res judicata because Phillips had raised the issue on direct appeal and the Ohio

Supreme Court had addressed the merits of the claim when it reviewed it for plain error.  State v.

Phillips, No. 20692, 2002 WL 274637, at *5 (Ohio Ct. App. Feb. 27, 2002).  While the Ohio

Supreme Court refused to consider the Fae Evans trial transcript in its opinion, the Ninth District

noted that the Ohio Supreme Court was able to decide the collateral estoppel issue without it.

Id.  Thus, it concluded that the Ohio Supreme Court's plain error review of the claim resolved

the collateral estoppel issue and that there was no need to revisit the claim with the addition of

the Fae Evans trial transcripts.  It therefore concluded that the claim was barred by res judicata.

While Phillips attempts to argue that he never received a merit review of this claim

because both the Ohio Supreme Court and Ninth District Court barred it on grounds of res

judicata, this supposition understates the actual analysis the Ohio Supreme Court performed.  In

reviewing for plain error, the court addressed each aspect of Phillips's collateral estoppel

argument.  Thus, this claim is procedurally defaulted because, as the Ohio Supreme Court held,

he failed to raise it below.

Phillips alternatively argues that, even if the Court finds this claim to be procedurally

defaulted, he can establish cause and prejudice to excuse the default because his trial counsel

were ineffective for failing raise this issue during trial.  Courts have held that ineffective

assistance of counsel, if proved, is sufficient to satisfy the "cause" prong for excusing procedural

default.  See, e.g., White v. Schotten, 201 F.3d 743, 753 (6th Cir. 2000), cert. denied, 531 U.S.

940 (2000) (holding that appellate counsel was ineffective and permitting district court to address

merits of claim if petitioner could demonstrate prejudice), overruled on other grounds by, Lopez

v. Wilson, 426 F.3d 339 (6th Cir. 2005); Hollis v. Davis, 912 F.2d 1343 (11th Cir. 1990), cert.

denied, 503 U.S. 938 (1992) (determining counsel's ineffectiveness for failure to challenge racial

composition of jury sufficient to establish "cause" to excuse procedural default).

The analysis does not end with this conclusion, however.  Phillips must demonstrate "that

[he] received ineffective assistance of counsel that rose to the level of a violation of [his] Sixth

Amendment rights" to successfully characterize counsel's conduct as cause and overcome the

procedural default hurdle.  Seymour v. Walker, 224 F.3d 542, 550 (6th Cir. 2000).  Specifically,

petitioner must satisfy the two-prong test for ineffective assistance of counsel set forth in

Strickland v. Washington, 466 U.S. 668 (1984).  As stated above, a petitioner must demonstrate

that counsel's errors were so egregious that "counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment."  Id.  Second, the petitioner must show that

he or she was prejudiced by counsel's errors.  "This requires showing that counsel's errors were

39

so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Id.  If a

petitioner cannot fulfill the requirements of one prong of the Strickland test, a court need not

undergo an analysis of the second prong and can conclude that a habeas petitioner was provided

with effective assistance of counsel in accordance with the Sixth Amendment. See Lundgren v.

Mitchell, 440 F.3d 754, 770 (6th Cir. 2006)("If [a petitioner] fails to prove either deficiency or

prejudice, then Petitioner's ineffective assistance of counsel claims must fail.")(quoting

Strickland,  466 U.S. at 697).

     Phillips cannot excuse the default of his collateral estoppel claim.  Because the Court

finds below that this claim lacks merit, it consequently must determine that Phillips cannot

establish the prejudice necessary to demonstrate ineffective assistance of counsel.  Thus, it is

procedurally defaulted.

     This claim lacks merit in any event.  The United States Supreme Court has held that non-

mutual collateral estopped is inapplicable in criminal cases.  Standefer v. United States, 447 U.S.

10 (1980); see also United States v. Dominguez, 359 F.3d 839, 845 (6th Cir. 2004)(recognizing

Standefer prohibition and policy concerns on which holding was based).  In that case, the

defendant attempted to utilize the collateral estoppel doctrine to assert that the government was

estopped from convicting him for aiding and abetting an IRS agent in unlawful acts when the co-

defendant IRS agent had been acquitted of committing those unlawful acts.  Noting that in a

criminal case the government does not always have the opportunity to have a "full and fair"

opportunity to litigate issues because of limitations it must endure to ensure the rights of the

criminal defendant, the Standefer Court declined to apply the non-mutual collateral estoppel

doctrine to criminal cases.  It concluded that there is a "simple, if discomforting, reality that

'different juries may reach different results under any criminal statute.  That is one of the

consequences we accept under our jury system.'"  <u>Standefer</u>, 447 U.S. at 25 (*quoting* <u>Roth v.</u>

<u>United States</u>, 354 U.S. 476, 492 n.30 (1957)).

On plain error review, the Ohio Supreme Court acknowledged the <u>Standefer</u> and other

United States Supreme Court precedent in its opinion.  It reasoned:

> In his second proposition of law, appellant claims that the state was collaterally
> estopped from proving that appellant killed Sheila on January 18, 1993, because
> the state had previously proved during Fae Evans's trial that Sheila's death was
> caused on January 16, 1993. The United States Supreme Court in <u>Ashe v.</u>
> <u>Swenson</u> (1970), 397 U.S. 436, 443, stated that collateral estoppel, or issue
> preclusion, "means simply that when an issue of ultimate fact has once been
> determined by a valid and final judgment, that issue cannot again be litigated
> between the same parties in any future lawsuit." The <u>Ashe</u> Court further
> concluded that the Double Jeopardy Clause incorporates the doctrine of collateral
> estoppel in criminal proceedings. <u>Id.</u> at 445. Appellant contends that in the instant
> criminal action the state cannot make any factual claims which are inconsistent
> with the conviction obtained in Evans's prior criminal proceeding.
>
> * * *
>
> Appellant cannot succeed on his claim of criminal collateral estoppel given his
> inability to satisfy one of the hallmarks of the doctrine: mutuality of parties. <u>See</u>
> <u>Standefer v. United States</u> (1980), 447 U.S. 10. The defendant in <u>Standefer</u>
> asserted the same arguments that appellant offers and failed. <u>Id.</u> at 14.  The prior
> proceeding to which appellant points involved Evans and the state. Appellant was
> not a party to that action. Moreover, criminal collateral estoppel derives from the
> Double Jeopardy Clause, and Evans's prosecution did not put appellant in
> jeopardy. <u>Ashe v. Swenson</u>, <u>supra</u>, 397 U.S. 436; <u>Massachusetts v. Dias</u> (1982),
> 432 N.E.2d 506. Collateral estoppel may be used to bar a later prosecution for a
> separate offense only where the government loses in the first proceeding. <u>See</u>
> <u>United States v. Dixon</u> (1993), 509 U.S. 688, ----.

<u>Phillips</u>, 656 at 654-55 (parallel citations omitted).  The Ohio Supreme Court held, moreover,

that, even if it were to consider the Evans trial transcripts, Phillips's claim would lack merit:

> Contrary to appellant's contention, the findings of the trial court in this case are
> not inconsistent with the finding related to Evans's conviction. Evans was
> convicted of involuntary manslaughter predicated on child endangering, in that

41

> she recklessly failed to seek medical attention for her daughter's injuries between January 16 and January 18, 1993. State v. Evans, supra, 637 N.E.2d 969. The evidence in the instant action clearly demonstrates that appellant hastened Sheila's death. Having done so, appellant cannot escape criminal liability by arguing that Sheila was going to die anyway. See 1 LaFave & Scott, Substantive Criminal Law (1986) 395, Section 3.12(b).

Phillips, 656 N.E.2d at 655 n.2 (parallel citation omitted).

Neither the Ohio Supreme Court's application of United States Supreme Court precedent nor its factual findings were unreasonable. First, the court reasoned that, under the doctrine of collateral estoppel, Phillips's circumstances were not such that there was mutuality of parties, as is required to apply the doctrine and that Phillips's right against Double Jeopardy was not violated by the Evans trial finding. It found, moreover, that the circumstances of Sheila's death permitted the prosecution to argue different theories against the two defendants but that those theories were not mutually exclusive. Thus, the State argued in the Fae Evans trial that the events occurring on January 16, 1993, made Sheila's death inevitable, while it argued in Phillips's trial that the rape and beating of Sheila on January 18, 1993, served to hasten her death. Thus, as the Ohio Supreme Court concluded, the State's theory of Sheila's murder in Phillips's trial was not actually inconsistent with the theory it proffered in the Evans trial. Accordingly, Phillips's fourth ground for relief is not well-taken.

### C. Fifth Ground for Relief

Phillips alleges that he was denied due process of law and the right to a fair trial when a grand juror spoke to the jurors impaneled for his trial during a break from trial proceedings. During this break, a woman approached four jurors and one alternate who were outside the courthouse cafeteria smoking cigarettes. She identified herself as a grand juror and complained that she was obligated to serve for four months. She then made a statement to the effect that she

42

had seen many cases and hoped that Phillips received the sentence he deserved.  The five jurors then walked away immediately and reported the incident to the trial judge's bailiff.  Thereafter, the trial judge individually voir dired each jury member and the grand juror who made the statements.

The due process clause of the United States Constitution states that a criminal defendant has the right to a fair trial and to be tried by a fair and impartial jury.  The right to due process, however, does not necessarily require a new trial in every instance in which a juror is potentially biased.  Smith v. Phillips, 455 U.S. 209, 217 (1982).  Rather, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  Id.  (citing Remmer v. United States, 347 U.S. 227 (1954)).

In Zuern v. Tate, 336 F.3d 478 (6th Cir. 2003), the Sixth Circuit held that when a habeas court addresses a claim of juror misconduct it must consider four points: (1) whether the state court held a hearing; (2) that no presumption of prejudice arises from any improper contact; (3) that the petitioner bears the burden of proving actual bias; and, (4) that juror testimony at a hearing is not inherently suspect.  Id. at 486 (quoting United States v. Rugerio, 20 F.3d 1387, 1390 (6th Cir. 1994)).  The Zuern Court found that the petitioner's juror misconduct claim had no merit because the trial court held a hearing on the issue and found that the juror in question could be fair and impartial, and defense counsel failed to object to the juror's continued presence on the panel.  Id.

Here, the Ohio Supreme Court analyzed this claim on direct appeal.  It held:

When a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communication biased the juror.

43

Smith v. Phillips (1982), 455 U.S. 209 ; Remmer v. United States (1954), 347
U.S. 227, 229-230. "In a criminal case, any private communication * * * with a
juror during a trial about the matter pending before the jury is, for obvious
reasons, deemed presumptively prejudicial * * *. [T]he burden rests heavily upon
the Government to establish, after notice to and hearing of the defendant, that
such contact with the juror was harmless to the defendant." Id. The Sixth Circuit,
however, has held that the defense must prove that the juror has been biased.
United States v. Zelinka (C.A.6, 1988), 862 F.2d 92, 95, *citing* Smith v. Phillips,
supra; *contra* United States v. Littlefield (C.A.9, 1985), 752 F.2d 1429, 1431. In
cases involving outside influences on jurors, trial courts are granted broad
discretion in dealing with the contact and determining whether to declare a
mistrial or to replace an affected juror. See United States v. Daniels (C.A.6,
1976), 528 F.2d 705, 709-710; United States v. Williams (C.A.D.C.1987), 822
F.2d 1174, 1189; Annotation (1992), 3 A.L.R.5th 963, 971, Section 2.

Appellant has failed to demonstrate that the trial judge in this case abused his
discretion in proceeding with the trial and retaining the jurors.  Each of the five
jurors stated without hesitation that he or she would disregard [the grand juror's]
comments. In fact, one juror indicated that the incident reinforced her
commitment to be fair. A juror's belief in his or her own impartiality is not
inherently suspect and may be relied upon by the trial court. Smith v. Phillips,
supra, 455 U.S. at 217, fn. 7; Zelinka, supra, 862 F.2d at 95-96. Furthermore, the
jurors' actions in this case reveal that they understood both the impropriety of [the
grand juror's] remarks and their own obligation to be fair. First, when [the grand
juror] began speaking about appellant and his case, the jurors immediately left the
area and reported the contact to the bailiff. Thereafter, each juror made a
conscious decision not to discuss [the grand juror's] comments with one another.

State v. Phillips, 656 N.E.2d 643, 660-61 (Ohio 1995).

Clearly, the Ohio Supreme Court's opinion is not an unreasonable application of United

States Supreme Court precedent.  First, the court identified several key Supreme Court cases

such as Remmer and Smith that involve improper juror contact.  In reviewing the claim, the court

observed that the trial court held a hearing, interviewing all panel members as well as the grand

juror who initiated the improper contact.  Moreover, each juror, as the Ohio Supreme Court

noted, indicated that he or she could disregard the grand juror's comment and be fair in rendering

a decision.  Thus, the Ohio Supreme Court's decision to find this claim without merit is not

44

clearly contrary to any Supreme Court law nor does it unreasonably apply the facts.

Finally, Phillips cites to <u>Stockton v. Virginia</u>, 852 F.2d 740 (4th Cir. 1988), to bolster his assertion that the State bears the burden of establishing that comments made during improper contact with a juror were not prejudicial.  In <u>Stockton</u>, the Fourth Circuit held that the restaurant proprietor's comment to some jurors that "they ought to fry the son-of-a-bitch" rendered the petitioner's trial fundamentally unfair and violated his right to due process.  When reviewing this claim on direct appeal, the Ohio Supreme Court acknowledged the <u>Stockton</u> decision but held that "the comments made by [the grand juror] were not inflammatory so as to prejudice the members of the jury."  <u>Id.</u> at 661.  The Court finds that this application of United States Supreme Court precedent is a reasonable one.  While the grand juror did state that she hoped Phillips got the sentence he deserved, her comments did not extend to suggesting what that sentence should be.  Accordingly, Phillips's fifth ground for relief is not well-taken.

### D. Sixth Ground for Relief

Phillips's sixth ground for relief is that defense counsel provided constitutionally ineffective assistance of counsel during the all phases of the trial in violation of his Sixth and Fourteenth Amendment rights.  Phillips alleges eight instances of counsel's deficient conduct: (1) failure to voir dire a juror who knew Phillips; (2) failure to sufficiently question venire members during voir dire; (3) failure to object to the composition of the venire because it did not represent a cross-section of the community; (4) failure to raise a collateral estoppel defense regarding the cause and time of Sheila Evans's death; (5) conceding Phillips's guilt and expressing distaste for him as part of counsel's overall trial strategy; (6) failure to investigate and present mitigating evidence; (7) failure to object to the trial court's instructions defining purpose to kill, causation,

45

and regarding the jury's responsibility; and, (8) cumulative failures of trial counsel.

As noted previously, to successfully assert an ineffective assistance of counsel claim, a petitioner must satisfy the familiar two-prong test for ineffective assistance of counsel set forth in Strickland v. Washington, 466 U.S. 668 (1984).  First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id.  Second, the petitioner must show that he or she was prejudiced by counsel's errors.  "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.

A petitioner must point to specific errors in counsel's performance.  United States v. Cronic, 466 U.S. 648, 666 (1984).  Thereafter, a reviewing court must subject the allegations to rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690.  A reviewing court must strongly presume that counsel's conduct was reasonable and might be part of a trial strategy. Id. at 689.  "'Judicial scrutiny of a counsel's performance must be highly deferential' and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Cone v. Bell, 535 U.S. 685, 698 (2002)(quoting Strickland, 466 U.S. at 689).

To ascertain whether counsel's performance prejudiced a criminal proceeding, a reviewing court does not speculate whether a different strategy might have been more successful, but a court must "focus[] on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506

46

U.S. 364, 372 (1993).

Of Phillips's eight sub-claims, the Court addresses two of them as distinct claims elsewhere in this Opinion and finds them to be without merit.  Because Phillips cannot establish, as he must pursuant to Strickland, that he was prejudiced by counsel's performance, the Court finds sub-claims (4) and (7) to be without merit.  The Court reviews the remaining sub-claims below.

### 1. Sub-claim (1)

Phillips argues that trial counsel were ineffective for failing to voir dire venire member Vicki Sandmann, who he alleges knew him but failed to so state when the trial court asked whether any members of the panel were familiar with the parties.  During habeas proceedings, the Court permitted Phillips to supplement his post-conviction affidavit to explain the extent of his acquaintance with Ms. Sandmann.  In that affidavit, Phillips explains that as part of a program at South Alternative High School which he attended, he accompanied one of his teachers to Valley View Nursing Home to provide residents with wood-shop projects to complete.  (Doc. No. 47, Ex. 4, at 1).  He stated that he visited the nursing home three Fridays of each month for approximately 1 1/2 to 2 hours from the fall of 1991 until his arrest in 1993.  Id.

During his visits, Phillips averred that he became acquainted with Ms. Sandmann, who was  employed by the nursing home.  He stated that he spoke with Ms. Sandmann on several occasions, revealing that is mother and sister were nurses.  Phillips also stated that he believed Ms. Sandmann once procured a nursing home employment application for him.  Id. at 1-2.  He concluded that, after volunteering for approximately 18 months at the Valley View nursing home, he believed that Ms. Sandmann would have recognized him during voir dire.  Id.  Phillips

47

asserts that, after making counsel aware of this acquaintance, counsel should have questioned Sandmann to unearth any ill feelings she may have harbored towards him.  Phillips raised this claim to the Ninth District Court of Appeals during post-conviction proceedings.  That court rejected the claim on the merits.  Thus, it is preserved for habeas review.

In its opinion, the Ninth District Court of Appeals found Phillips's claim lacked merit.  It held that, as with his due process claim on the same grounds, Phillips could not establish Sandmann recognized Phillips or that she was actually biased against him.  Additionally, it held that counsel were not ineffective for failing to question Sandmann about her acquaintance with Phillips:

> Mr. Phillips' ineffective assistance of trial counsel claim similarly fails because he has failed to set forth sufficient operative facts demonstrating that he suffered prejudice as a result of his trial counsel's allegedly deficient performance. See Calhoun, 714 N.E.2d 905. Furthermore, trial counsel's decision not to pursue the matter, despite being informed by Mr. Phillips, may be viewed as a valid trial strategy in that trial counsel may have intended to place on the jury a juror, who presumably would have had a more favorable opinion of Mr. Phillips due to Mr. Phillips' good service at the nursing home. See State v. Clayton (1980), 402 N.E.2d 1189 (writing that debatable trial tactics generally do not constitute a deprivation of effective counsel); see, also, State v. Hartman (2001), 754 N.E.2d 1150 (stating that an appellate court must indulge in a strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance). Based on the foregoing, this court concludes that the trial court did not err in finding that Mr. Phillips had failed to set forth sufficient operative facts to establish substantive grounds for relief regarding his fourth ground for relief.

State v. Phillips, No. 20692, 2002 WL 274637, at *6 (Ohio Ct. App. Feb. 27, 2002).

The Court cannot find, as it must to grant Phillips relief, that the Ninth District Court of Appeals's decision was an unreasonable application of Strickland.  As it noted when examining the underlying substantive claim, Phillips does not demonstrate that Sandmann actually recognized him or that she was biased against him.  Moreover, the Ninth District presumed, in

48

accordance with the Strickland holding, that counsel's decision not to reveal their acquaintance may have been a strategic one because counsel may have wanted Sandmann on the jury as she had known Phillips performed acts of community service. Thus, the Court finds this sub-claim to be not well-taken.

### 2. Sub-claim (2)

Phillips next complains that counsel were ineffective in numerous instances during voir dire. He contends that counsel should have attempted to rehabilitate venire members who expressed reservations about the death penalty and questioned others who appeared to favor it. Additionally, Phillips alleges trial counsel's ineffectiveness for failing to ask questions concerning the mitigation factors counsel would present during the penalty phase of trial (i.e., Phillips's youth and lack of prior criminal record). He also asserts that counsel made no effort to familiarize themselves with the venire members. As proof that counsel were ineffective during voir dire, Phillips maintains, counsel failed to exhaust all of his peremptory challenges.

The Respondent concedes that all but Phillips's peremptory challenge claim are preserved for habeas review. Phillips does not counter that the peremptory challenge sub-claim is not defaulted or that he can establish a reason to excuse the default. Thus, the Court finds that claim to be procedurally defaulted and will address all but that aspect of Phillips's ineffective assistance during voir dire claim.

In Witherspoon v. Illinois, 391 U.S. 510, 521-22 (1968), the United States Supreme Court invalidated a capital sentence when the trial court excused all jurors who expressed a conscientious objection to the death penalty. The Court reasoned that the proper inquiry was not whether a prospective juror opposed the death penalty generally, but whether the juror's

49

religious, moral or philosophical beliefs would prevent him or her from following the court's

instructions.  Id. at 514 n.7 ("[E]ven a juror who believes that capital punishment should never be

inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his

personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the

laws of the State.").

   The Court revisited this issue after lower court confusion about how to apply the

Witherspoon standard, determining:

> [A] juror may not be challenged for cause based on his views about
> capital punishment unless those views would prevent or
> substantially impair the performance of his duties as a juror in
> accordance with his instruction and his oath.  The State may insist,
> however, that jurors will consider and decide the facts impartially
> and conscientiously apply the law as charged by the court.

Adams v. Texas, 448 U.S. 38, 45 (1980); see also Wainwright v. Witt, 469 U.S. 412, 424

(1985)(affirming Adams standard).  Given the subjective nature of any such determination, the

Court cautioned that "deference must be paid to the trial judge who sees and hears the juror."

Witt, 469 U.S. at 426.

   In Morgan v. Illinois, 504 U.S. 719 (1992), the Court reviewed a so-called "reverse

Witherspoon" case in which the Court determined that a trial court must excuse for cause any

juror who would automatically impose the death penalty.  The Morgan Court concluded that

"[a]ny juror who states that he or she will automatically vote for the death penalty without regard

to the mitigating evidence is announcing an intention not to follow the instructions to consider

the mitigating evidence and to decide if it is sufficient to preclude imposition of the death

penalty."  Id. at 738.   Thus, the Court instructed trial courts that, regardless of a juror's personal

beliefs, the juror must be able to follow the law to ensure a defendant's right to a fair trial.

50

Witherspoon and Morgan demonstrate that part of the criminal defendant's right to a fair trial includes his or her right to a jury that is not immutably predisposed in its sentencing decision.  Thus, any inaction on the part of trial counsel that would result in a jury that could not follow the law in formulating that decision could be grounds for a petitioner to assert that his or her Sixth Amendment right to effective assistance of counsel was violated.  The Ohio Supreme Court found no such violation occurred during Phillips's voir dire.  In denying these claims on direct appeal, the Ohio Supreme Court utilized the above precedent:

> Appellant next asserts that his counsel failed to probe the views of five members of the venire who indicated that they could not or would not vote for the death penalty, in order to keep them from being excused for cause. A review of the record indicates that counsel did attempt to rehabilitate some of those individuals. Further, each expressed strong feelings that he or she would be unable to follow the law in the event that the death penalty was warranted. This court has previously rejected similar claims concerning the selection of members of the venire because "counsel were in a much better position to determine if the jurors could be 'rehabilitated' * * *." Bradley, supra, 538 N.E.2d at 381.
>
> Appellant also complains that counsel failed to challenge for cause members of the venire who favored the death penalty. A juror's death-penalty views are cause for exclusion only if they prevent or substantially impair his or her ability to follow the law. Morgan v. Illinois (1992), 504 U.S. 719, 728; Wainwright v. Witt (1985), 469 U.S. 412, 424. Appellant has not proven such impairment, and again, trial counsel stands in the better position to determine which members of the venire merit in-depth examination. Bradley, supra.

Phillips, 656 N.E.2d at 658-59 (parallel citations omitted).

The Ohio Supreme Court did not unreasonably apply Strickland in holding that these claims lack merit.  As that court noted, counsel are in the best position to determine which panel members are in need of further questioning.  Thus, appellate courts must give strong deference to counsel's tactical decisions at that juncture of the proceedings.  Moreover, the court found that, contrary to Phillips's assertions, trial counsel did attempt to rehabilitate some of the jurors who

51

expressed reservations about imposing the death penalty.

Finally, Phillips asserts that trial counsel were ineffective during voir dire because they failed to question prospective jurors regarding their views of the mitigating factors of youth and lack of a prior criminal record.  The Ohio Supreme Court rejected this claim on direct appeal, stating:

> Appellant also claims that his trial counsel was deficient in failing to question prospective jurors during voir dire about mitigation evidence. The members of the venire in this case were "death-qualified" in small groups. The record reveals that defense counsel posed questions to some members of each group as to whether they were capable of considering mitigation evidence. While it is true that the defense did not address specific mitigating factors, this court has upheld a trial court's refusal to permit such specific mitigation questions. See State v. Bedford (1988), 529 N.E.2d 913, 920. Asking such questions is not essential to competent representation.

Id. at 659.

Like the Ohio Supreme Court, this Court cannot find precedent for Phillips's assertion that questioning the venire regarding specific mitigating factors is a prerequisite to affording a criminal defendant constitutionally effective assistance.  The Ohio Supreme Court's decision to deny this claim is not clearly contrary to or an unreasonable application of Strickland.  Thus, this sub-claim is not well-taken.

### 3. Sub-claim (3)

Phillips next argues that his jury did not represent a cross-section of the community because African-Americans were under-represented on the jury.  He contends that trial counsel were ineffective for failing to object to the jury composition.

A petit jury venire must represent a "fair cross section of the community." Holland v. Illinois, 493 U.S. 474, 480 (1990); Taylor v. Louisiana, 419 U.S. 522, 528-29 (1975).  To

52

establish a prima facie violation of the fair cross-section requirement, the petitioner must show that (1) the group which allegedly was excluded is a distinctive group in the community; (2) the representation of this group in venires is not reasonable when compared to the number of such persons in the community; and (3) the under representation is due to a systematic exclusion of the group in the jury selection process.  Duren v. Missouri, 439 U.S. 357, 367-68 (1979).

Applying this constitutional test, the Ninth District Court of Appeals found on post-conviction appeal that counsel were not ineffective for failing to object to the jury's composition:

> Mr. Phillips argued that his convictions are void or voidable because the underrepresentation of African Americans on his jury venire violated his Sixth Amendment right to be tried by a jury representing a fair cross-section of the community and the Fourteenth Amendment equal protection guarantee. Additionally, he asserted that he was denied the effective assistance of trial counsel, as his trial counsel failed to raise the issue.
>
> To establish a prima facie violation of the Sixth Amendment's fair cross-section requirement, a defendant must show:
>> "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to systematic exclusion of the group in the jury-selection process."
>
> State v. Jones (2001), quoting Duren v. Missouri (1979), 439 U.S. 357, 364. Significantly, "underrepresentation on a single venire is not systematic exclusion." (Emphasis original.) State v. McNeill (1998), 700 N.E.2d 596.
>
> In support of this claim, Mr. Phillips attached his own affidavit, census data of Summit County, and a list of the people on his jury venire. This evidence tended to show that African Americans comprised approximately twelve percent of the population of Summit County but comprised only approximately one percent of Mr. Phillips' jury venire.  Mr. Phillips, however, has failed to set forth sufficient operative facts establishing systematic discrimination, instead, basing his argument solely on the alleged underrepresentation on his venire. As previously mentioned, underrepresentation on a single venire is insufficient to show systematic exclusion.  Id.  This court, therefore, holds that the trial court did not err in concluding that Mr. Phillips failed to set forth sufficient operative facts establishing substantive grounds for relief on his Sixth Amendment fair

cross-section claim.

* * *

Lastly, Mr. Phillips' ineffective assistance of counsel claim based upon his trial counsel's failure to raise these issues before the trial court likewise lacks merit because Mr. Phillips has failed to set forth sufficient operative facts to demonstrate prejudice resulting from his trial counsel's allegedly deficient representation. <u>See</u> <u>Calhoun</u>, 714 N.E.2d 905.

<u>Phillips</u>, 2002 WL at *7.

As the Ninth District held, Phillips fails to establish pursuant to <u>Duren</u> that Summit County systematically excluded African-Americans in its jury pools.  Thus, he cannot establish the prejudice required to obtain habeas relief pursuant to <u>Strickland</u>.  This sub-claim lacks merit.

### 4. Sub-claim (5)

Phillips maintains in this sub-claim that counsel were ineffective because of their trial strategy of conceding guilt to some of the crimes with which he was charged but not to the extent the State alleged.  He also takes issues with counsel's disparaging comments of him during closing arguments.  Phillips raised both claims to the Ohio Supreme Court on direct appeal.  Thus, they are preserved for habeas review.

The Respondent asserts that Phillips has waived the trial strategy argument because he agreed to counsel's trial strategy on the record prior to trial.  Phillips informed counsel at the commencement of the trial that he no longer deemed acceptable counsel's strategy of admitting to some of the crimes but denying the extent of his involvement.  Although Phillips thereafter rescinded this statement, counsel were uncertain of Phillips's final stance and sought to have his acquiescence to it on the record.  Accordingly, the trial court conducted the following *in camera* hearing:

54

THE COURT:     We're here at the request of the Defense and we are in

chambers.  Mr. O'Brien.

MR. O'BRIEN:     Your honor, throughout the preparation of this case Mr.

Edminister, my co-counsel, and I have conferred with Ronald

Phillips on numerous occasions and because of the rather heinous

nature of the crime, it has taken us quite a long time to develop

what we believe is a cohesive theory, or at least advancable theory

for the Defense.

Last week I met with Ron . . . in the jail and we went over

our theory with Mr. Phillips and that theory is going to be that Mr.

Phillips did commit some of these crimes but not to the degree or

to the level that the State would have you believe and Mr. Phillips

acknowledged that that was an acceptable defense and he would

agree to it.

At the start of the opening statements of Miss Bandy just

about 15 minutes ago, Mr. Edminister leaned over and said that

Mr. Phillips was having trouble . . . with that theory.

* * *

So at this point in time, I'm going to ask my client, Ronald

Phillips if he's in accord with the theory that I just stated  . . .  .

* * *

55

[The Defendant is thereafter put under oath.]

MR. O'BRIEN:       Ron, you just heard what I said about our discussion before with

myself and Mr. Schultz and your discussion with Mr. Edminister

and we want to be absolutely sure, because this is a death penalty

case, you can't be on different pages, we have to be on the same

wave length, to use a couple of cliches here in a row.  Now, are you

in accord with what I just stated here on the record?

THE DEFENDANT:  Yes.

MR. O'BRIEN:       So you're asking me that when I get out there and in opening

statement, you're acknowledging and agreeing with the fact that

I'm going to tell those jurors that you committed some of these

crimes but not to the degree the State would want them to believe;

is that correct?

THE DEFENDANT:  Correct.

(Doc. No. 39, at 629-632).  Based on the above *in camera* colloquy in which he agreed to

counsel's trial strategy, the Respondent asserts, Phillips cannot now maintain that his trial

counsel were ineffective for advancing it during trial.

While it is arguable that the Court should not conclude that a defendant who is of low

average intelligence is fully capable of waiving future ineffective assistance claims based on

statements he made at the onset of trial, it also does not find that counsel's decision to pursue this

trial strategy was constitutionally deficient.  As the Ohio Supreme Court stated on direct appeal:

Appellant overlooks the fact that he had confessed to performing most of the acts
of which he was accused. That confession made it very difficult for his attorneys

56

to deny that the beating or the previous rapes had occurred, or to present any type of viable defense. It is "logical trial strategy" to contest the most serious charges and to concede those that are supported by "indisputable evidence and credible testimony." United States v. Simone (C.A.7, 1991), 931 F.2d 1186, 1195. See, also, United States v. Leifried (C.A.4, 1984), 732 F.2d 388, 390. Appellant asserts that his trial counsel should have argued solely that Sheila's death was caused by the January 16 beating. Counsel's rejection of this strategy, however, was neither deficient nor prejudicial given Dr. Cox's uncontradicted testimony that the January 18 beating led to the girl's death. Furthermore, the record indicates that defense counsel repeatedly challenged the state's proof of the felony-murder specification and urged the jury to consider a lesser included offense.

State v. Phillips, 656 N.E.2d 643, 658 (Ohio 1995).

The Ohio Supreme Court logically concluded that Phillip's confession left counsel with the Hobson's choice of conceding his partial involvement in the horrific rapes, beatings, and ultimate death of a three-year-old, or denying his involvement in these crimes against a tide of evidence incriminating him.  As counsel stated on the record, the heinous nature of the crimes made their trial strategy decision an understandably difficult one.  Conceding involvement in her beating while resisting those elements of the offense which would render it death eligible was entirely reasonable.  Indeed, that is precisely the position habeas counsel has taken before this Court. Contrary to Phillips's assertion, and as noted by the Ohio Supreme Court, defense counsel did focus on the one wrongful act to which Phillips did not confess and attempted to dispute the State's argument that Phillips raped Sheila on the morning of her death.  Because the Ohio Supreme Court proffered several sound reasons why counsel's actions were reasonable under the circumstances, the Court finds that its holding was not contrary to Strickland.  Phillips cannot prevail on this claim.

Equally without force is Phillips's assertion that his counsel were constitutionally deficient because they disparaged him to the jury.  As the Ohio Supreme Court opined, "[g]iven

57

appellant's confession to beating and to raping the three-year-old[,] trial counsel likely believed that his candor and objectivity would enhance his credibility of his plea for appellant's life." Phillips, 656 N.E.2d at 659.  Because the victim in this case was a three-year-old girl who was violently beaten and raped, and Phillips admitted to both of those acts, albeit at different points in time, it was not unreasonable for the Ohio Supreme Court to conclude that defense counsel's attempt to distance himself from Phillips was a strategic attempt to ingratiate himself with the jury and to help them focus on the important factual distinctions he was asking them to draw. Accordingly, this sub-claim is not well-taken.

### 5. Sub-claim (6)

In this sub-claim, Phillips contends that he received ineffective assistance of counsel during the penalty phase of trial.  He argues that his counsel were deficient in several respects. First, Phillips claims that defense counsel failed to conduct an adequate investigation into his background and obtain all CSB records pertaining to his family.  Phillips asserts this investigation would have yielded a far more meaningful presentation and explanation of his life and of his commission of these crimes than the picture counsel presented during trial.  Phillips also alleges that counsel were inadequate for failing to provide the defense psychologist, Dr. Brown, with all documents necessary for him to render a complete and accurate mental health conclusion.

The United States Supreme Court has expounded on the Strickland standard relative to claims that trial counsel failed to investigate and present mitigating evidence regarding a defendant's background.  In Wiggins v. Smith, 539 U.S. 510 (2003), the Court held that counsel's failure to investigate and present to the jury mitigating evidence was unreasonable.

58

There, the Court held that trial counsel's failure to discover evidence of the petitioner's difficult childhood was a Sixth Amendment violation.[19]   The Court found that counsel's decision not to expand their investigation in the wake of reviewing several documents diagnosing the petitioner's mother as an alcoholic and the petitioner's placement in several foster homes was an abdication of the duties imposed on counsel pursuant to Strickland.

The Wiggins Court cautioned, however, that "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Id. at 527.   While Strickland established that strategic decisions generally are not subject to challenge, the Wiggins Court emphasized that these decisions are not immune from attack if they are founded upon an unreasonable investigation.  Id.   Finding that the information the petitioner's trial counsel already had reviewed triggered a duty to investigate the petitioner's background further, the Court held that trial counsel's actions were objectively unreasonable under Strickland.

To discern whether a petitioner was prejudiced by counsel's actions, a habeas court must determine "whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Rompilla v. Beard, – U.S. – , 125 S.Ct.

---

[19]        The Court noted the extensive hardships the petitioner faced during childhood:
> [P]etitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage.  Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked.  . . .  Petitioner's first and second foster mothers abused him physically and . . . the father in his second foster home repeatedly molested and raped him.

Id. at 516-7 (citations omitted).

59

2456, 2467 (2005)(internal quotation marks and citations omitted); Dickerson v. Bagley, 453

F.3d 690 (N.D. Ohio 2006).

Following the Wiggins Court's example, the Sixth Circuit held in Hamblin v. Mitchell,

354 F.3d 482, 486 (6th Cir. 2003), that courts must review trial counsel's actions in light of the

American Bar Association's guidelines.  Those guidelines suggest the need for counsel to

explore a petitioner's medical, educational, and employment history, as well as obtaining a

family and social history through, *inter alia*, contact with family members.  Id. at 487 n.2.  The

guidelines also state the necessity of reviewing a multitude of records to provide counsel with

clues regarding the client's "childhood abuse, retardation, brain damage, and/or mental illness . .

. ."  Id.  When analyzing an ineffective assistance of counsel claim on habeas review, a court

should consider both the evidence adduced at trial and the evidence adduced in the habeas

hearing.  Towns v. Smith, 395 F.3d 251, 257 (6th Cir. 2005).

The main thrust of Phillips's ineffective assistance of counsel during mitigation claim

arises from counsel's failure to investigate potentially mitigating evidence and present it during

the penalty phase of trial.  He also claims that counsel should have procured a mitigation

specialist and a second defense psychologist.  To assess the validity of these allegations, the

Court must begin with the investigation that counsel actually conducted and the mitigation

strategy that resulted therefrom.  As stated above, defense counsel Michael Edminister stated that

he interviewed family members, neighbors, and former teachers in an attempt to obtain a

complete portrait of his client and the Phillips family.  He obtained school records and had

lengthy conversations with Phillips regarding mitigation.  Edminister testified that he went to the

CSB to procure files about the family and discern whether there was a history of abuse or other

60

dysfunction in the family.  Edminister spoke extensively about his visit to CSB during his testimony.  He revealed that he was required to go accompanied by one of the prosecutors trying Phillips's case and a CSB lawyer.  He also testified that both the prosecutor and the CSB lawyer provided him with documents from the files.

When habeas counsel queried Edminister why he did not seek the trial court's permission to get copies of the files, he responded that there was no precedent for this type of request and that, based upon his familiarity with the trial judge and the process as it existed in Summit County, any such attempt would have been futile.  Edminister testified that, based on his interviews with family and friends, his discussions with Phillips himself, and his review of the CSB documents, he was unaware of any abuse or allegations of abuse in Phillips's family.

Defense counsel Kerry O'Brien also provided testimony during the evidentiary hearing regarding the mitigation investigation. O'Brien stated that he contacted the OPD to ascertain whether they could provide the defense with any financial aid in procuring an investigator. When the OPD responded negatively, O'Brien procured the only private investigator available in the area, Gerry Schultz.  Moreover, he asserted that the trial court provided only minimal funds to obtain an investigator, eventually reducing the amount approved so that defense counsel had to pay the remainder out-of-pocket.  Schultz, O'Brien revealed, was a former police officer who did not procure much valuable information for the defense team.

The fruits of counsel's mitigation investigation informed their mitigation strategy.  Based on his investigation, as Edminister testified during the hearing, he did not find, as he expected, a plethora of information revealing that Phillips was a psychological predator or had a background that logically would lead to the conduct in which he engaged.  Instead, every person with whom

Edminister spoke described Phillips as a "pleasant kid."  Edminister testified that Phillips also stated that there was no abuse in the family and proffered no explanation for Sheila's death other than his claim he had "snapped."  Edminister emphasized that, to him, it appeared that, Phillips had a relatively normal upbringing.  He noted that Phillips was not a truant, that teachers remarked positively about him, and that he lived in a nuclear family with a father who had steady work.  Based on the information he procured from Phillips, his family members, neighbors and teachers, Edminister testified, he decided to present a mitigation strategy in which he would allege that Sheila's death was an anomaly and that Phillips's life should be spared.  Thus, counsel pursued a mitigation strategy in which they attempted to depict Phillips as a good kid with potential who became overburdened by the struggles of new fatherhood and caring for Evans's two other young children.

During the mitigation hearing, counsel presented the testimony of several family members.  Phillips's grandmother, mother, father, brother, and Phillips himself all testified that, although Phillips was "no angel" and had been reprimanded on a few instances in school, he had no prior criminal record and was succeeding at South Alternative High School.  They disclosed that he had decided to enlist in military service as his father had done upon graduation from high school and that he hoped to become a diesel engine mechanic while there.  While attending high school and enrolled in vocational education courses, Phillips stated, he worked at a local McDonald's.

Phillips's family members also testified about his relationship with Fae Evans.  Phillips's mother stated that she had disapproved of the relationship, asserting that Evans was too old and too domineering for Phillips and warning of the responsibilities he would incur because she had

two young children.  Once Evans became pregnant with Phillips's child, however, Evans moved

into an apartment proximate to the Phillips family home so that Phillips could care for his infant

son.

Defense counsel also adduced testimony from psychologist Dr. James L. Brown.  Dr.

Brown testified that he interviewed Phillips on four occasions, spoke with his parents, and

administered several tests.  Dr. Brown testified that Phillips functioned in the low average range

of intelligence with an I.Q. score of 87.  He also stated that, based on the interviews and tests,

Phillips was a "rather simple, emotionally immature, psychologically inadequate person.  He

does not feel particularly connected with any people in his life, particularly socially.  He's

someone who harbors a lot of anger; feels frustrated very easily; lives with a lot of feelings of

insecurity, inadequacy, inferiority . . .  ."  (Doc. No. 43, at 106).  Dr. Brown noted that there was

an extensive criminal history in his family.  Indeed, both Phillips's father and mother testified

that they previously had been convicted for receiving stolen property and aggravated drug

trafficking.  Thus, Dr. Brown concluded that Phillips was raised in an antisocial family, which

shaped his personality.

He opined that Phillips possessed characteristics of antisocial and a number of other

personality disorders.  Individuals who possess these personality traits, Dr. Brown imparted,

typically have a low tolerance for stress.  Dr. Brown testified that, because Phillips experienced

repeated frustrations in his life, "[h]e gets to a point where his anger builds up usually so that it

comes out and it seems way out of proportion to what may trigger it at that one time."  Id. at 113.

Dr. Brown reasoned that Phillips would do well in a structured environment.

Finally, defense counsel called Lonnie Bell, a neighbor of Phillips's, to testify.  Bell

stated that the Phillips children were respectful and quite helpful to him.  Whenever he attempted to mow his lawn or shovel snow, Bell recalled, Phillips and his siblings would preclude him from doing so and complete the task for him.

Phillips argues that the mitigation testimony, as depicted above, was incomplete as was defense counsel's investigation of mitigation evidence.  During the hearing, habeas counsel asserted that defense counsel should have delved deeper into Phillips's background in an effort to explain why Phillips could commit such unspeakable acts on a child.  As the Respondent observes in her post-hearing brief, however, "[t]he evidentiary hearing in this case is more notable for what it did not reveal than for what it revealed."  (Doc. No. 92, at 3).

While habeas counsel argued that a more thorough investigation would have revealed familial abuse, the CSB records that habeas counsel produced for the hearing do not establish that Phillips himself was subjected to physical and sexual abuse.  Contained in the CSB records are documents generated from callers, presumably neighbors, who asserted that Phillips's father, William Phillips, frequently "abused" Tracy, Mary, and Eddie, his step-children, though the records do not describe the nature of the alleged abuse.  The CSB records also reference neglect of the home, based on its state of disrepair, and neglect of the children because they were unclean.  In addition to the CSB records, a post-conviction affidavit supplied by Mary Phillips, Phillips's half sister, alleges that William Phillips fondled her and her sister, Tracy.

As stated above, habeas counsel adduced the testimony of Dr. Smith, who concluded during the evidentiary hearing that Phillips likely had been sexually abused.  He did not base this opinion on Phillips's own disclosures, however.  Indeed, Phillips continues to deny that any sexual abuse occurred in his family.  Dr. Smith inferred that Phillips had been sexually abused

from Phillips's report of repeated incidences of impotence, his sexual role confusion, and his sexual deviance.

More noteworthy than the evidence adduced during the evidentiary hearing regarding the physical and/or sexual abuse of the Phillips family, was the absence of evidence that Phillips himself was ever the victim of abuse.  Despite Mary Phillips's affidavit alleging inappropriate contact between herself and her stepfather, Phillips did not elicit her testimony or that of any other family member at the hearing.   Phillips himself did not testify, moreover, that he was abused, presumably because he continues to assert that there <u>was</u> <u>no</u> physical or sexual abuse in his family.  Finally, Dr. Smith's conclusions were based on his hindsight suppositions which, though undoubtedly educated conclusions, are unsupported by Phillips's own descriptions of his life, or by testimony or documentation from either the family or those social workers whose job it was to monitor the activities in the family.

Subjecting counsel's investigation and presentation of mitigation testimony to the <u>Strickland</u> test as interpreted by <u>Wiggins</u>, the Court cannot find that counsel acted unreasonably. As stated above, Edminister spoke with Phillips himself, family members, friends, neighbors, and teachers to obtain background information about Phillilps.  He also procured school records and attempted to procure the CSB records.  Based on his evidentiary hearing testimony, while it is unclear whether Edminister ever viewed <u>any</u> records indicating familial abuse, it is clear that he never saw those documents indicating the kind of abuse Dr. Smith believes likely occurred. Phillips is hard-pressed to assert that counsel acted unreasonably for failing to uncover evidence of a childhood he asserts did not occur and which, even under Phillips's current theories, it takes medical expertise to discern.

65

Without any indication of physical or sexual abuse, it appears that counsel's chosen strategy of portraying this case as a "shaken baby syndrome gone terribly awry" was a reasonable one.  Counsel were faced with the Herculean task of devising a mitigation strategy when each avenue they searched for evidence to explain Phillips's behavior revealed that he was a nice kid from a good family.  While habeas counsel complain that trial counsel should have tried harder to explain Phillips's appalling actions, no information their investigation produced did so.

More importantly for purposes of performing a <u>Strickland</u> prejudice analysis, <u>habeas counsel</u> was unable to produce the mitigating information they chided trial counsel for failing to obtain.  As stated above, Phillips continues to deny that he was physically or sexually abused.  Dr. Smith's conclusions to the contrary are unsupported by objective evidence.  Additionally, as stated above, the CSB reports that habeas counsel regarded as the smoking gun at the evidentiary hearing did not reveal the nightmarish childhood Dr. Smith suspects or that the Supreme Court found present in the <u>Wiggins</u> case.  If counsel had chosen the strategy habeas counsel would have had them pursue, the jury would have heard that Phillips was <u>possibly</u> sexually abused, that his step-siblings were the target of verbal and physical abuse by his father, and that his father had fondled his step-sisters.  This information is hardly the astonishing revelation that habeas counsel purports it to be.

This case is similar to <u>Lorraine v. Coyle</u>, 291 F.3d 416 (6th Cir. 2002), in which the Sixth Circuit held that a habeas petitioner is not entitled to relief based on an ineffective assistance of counsel claim unless he or she can prove that counsel's alleged failures prejudiced the outcome of the state court proceeding.  There, the petitioner alleged that counsel was ineffective for failing to investigate and present mitigating evidence.  On habeas review, the district court found

66

ineffective assistance based on trial counsel's failure to develop evidence of the petitioner's organic brain damage.  Id. at 434.  The Sixth Circuit reversed, holding that the petitioner failed to demonstrate that trial counsel's failure to investigate prejudiced the outcome of the penalty phase when habeas counsel could find no evidence that the petitioner was actually brain damaged.  Id. at 436.

In several other Sixth Circuit opinions, the Court has held that a habeas petitioner is not entitled to relief on an ineffective assistance of counsel during mitigation claim unless the petitioner demonstrates that he or she was prejudiced by the outcome of that proceeding.  Most recently, in Slaughter v. Parker, 450 F.3d 224 (6th Cir. 2006), the Sixth Circuit found that, while trial counsel acted unreasonably because he failed to thoroughly investigate for mitigating evidence, the petitioner was not prejudiced by that failure because much of the information the petitioner asserted was omitted was adduced in the penalty phase by the petitioner's own testimony.  In denying the petitioner's claim on this ground, the Slaughter Court held that "there is an insufficient showing of prejudice where 'one is left with pure speculation on whether the outcome of the trial or the penalty phase could have been any different."  Id. at 234 (quoting Baze v. Parker, 371 F.3d 310, 322 (6th Cir. 2004)).  Here, as in Slaughter, this Court is left with mere speculation as to whether trial counsel's nice kid gone awry strategy or the strategy Phillips would have had him choose would have produced a better result for Phillips.  This conjecture is precisely the type of hindsight speculation that Strickland proscribes.

Both Ohio courts that opined on this issue reasonably concluded that counsel's conduct fell within the purview of competent behavior under Strickland.  The Ohio Supreme Court on direct appeal found that, contrary to Phillip's assertion that counsel introduced "paltry evidence,"

67

counsel produced six witnesses who amply supported counsel's mitigation theory.  State v.

Phillips, 656 N.E.2d at 659.  The Ninth District Court of Appeals was equally unpersuaded by

Phillips's assertions.  It held on post-conviction appeal:

> In his petition, Mr. Phillips attacked his trial counsel's mitigation strategy, asserting that such strategy was a result of poor preparation and inadequate investigation into his background. To that end, Mr. Phillips cites his counsel's failure to request Summit County Children's Services records and to obtain a mitigation specialist. He argues that, had more background information been obtained by his counsel, a reliable psychological evaluation could be performed and the jury could have been presented with complete mitigating evidence.
>
> * * *
>
> Initially, we note that hiring a mitigation specialist in a capital case is not a requirement of effective assistance of counsel. State v. McGuire (1997), 686 N.E.2d 1112. A review of the record in this case reveals that trial counsel performed an adequate investigation of Mr. Phillips' personal background and presented the expert testimony of a psychologist, thereby providing insight into Mr. Phillips' mental condition. Trial counsel chose to present Mr. Phillips as a caring, helpful, and decent person, who was a "salvageable" human being and would do well in prison. On the other hand, Mr. Phillips' petition subscribes to an alternative mitigation strategy, namely focusing on the dysfunction and abusive family environment and the absence of a moral and social compass for Mr. Phillips. The evidence adduced with the petition supports this alternative mitigation strategy--a strategy that may actually have been less persuasive.

State v. Phillips, No. 20692, 2002 WL 274637, at *11 (Ohio Ct. App. Feb. 27, 2002).

This Court cannot determine that the Ohio courts' applications of Strickland were

unreasonable.  As the Court explained above, trial counsel conducted a constitutionally adequate

investigation and developed a reasonable mitigation strategy.  Had counsel provided Dr. Brown

with the CSB and other records secured during the habeas litigation, and if counsel had procured

a mitigation specialist, counsel could have developed a mitigation strategy similar to that which

habeas counsel supplied to this Court at the evidentiary hearing.  Whether utilizing that abuse

theory of mitigation, with underwhelming proof to support it, would have produced a different

68

result is wholly speculative.  Thus, Phillips's claim that trial counsel were ineffective for failing

to investigate and present mitigating evidence is not well-taken.

### 5. Sub-Claim (8)

In this sub-claim, Phillips asserts a catch-all ineffective assistance of counsel claim,

contending that counsel were ineffective "for each instance, considered alone or cumulatively, in

which they did not properly object to an issue that has been raised in this proceeding."  (Doc. No.

12, at 31).  Because this sub-claim lacks specificity, the Court cannot address it and finds that it

is not well-taken.

### 6. Dr. Cox Cross-Examination

Before turning to Phillips's remaining grounds for relief, the Court notes that it has not

reviewed Phillips's claim that counsel were ineffective for failing to adequately cross-examine

Dr. Cox regarding his medical conclusions and his alleged bias in favor of the prosecution.

While habeas counsel devoted much attention to this claim during the evidentiary hearing,

counsel did not raise an ineffective assistance claim on this theory in the petition.  Instead, habeas

counsel raised this claim for the first time in the traverse.  Compare Doc. No. 12, at 21-31 with

Doc. No. at 32.  As stated above, this action is disfavored and the Court would be well within its

discretion to refuse to review this ground for relief on that basis.  Tyler v. Mitchell, 416 F.3d 500,

504 (6th Cir. 2005).

Out of an abundance of caution, however, the Court reviews this claim, but finds that it is

not well-taken.  While habeas counsel criticized trial counsel Kerry O'Brien for failing to cross-

examine Dr. Cox aggressively regarding his medical conclusions, O'Brien defended this action

during the hearing.  As stated above, O'Brien testified that the mood of the courtroom during Dr.

Cox's direct examination was one of shock and horror because of the emergency room and autopsy slides used to describe his conclusions to the jury.  Ultimately, disturbing testimony was required in order to describe such a heinous crime.  O'Brien further explained that Dr. Cox habitually engaged in "run-away testimony," in which he repeated at length the testimony he provided on direct examination when given an opportunity to do so during cross-examination.  Because he did not want Dr. Cox to repeat his troubling testimony, O'Brien explained, he chose not to question Dr. Cox extensively on cross-examination regarding whether Phillips had raped Sheila with his penis, or only with a finger as he claimed, on the morning of her death.

O'Brien's decision not to further query Dr. Cox regarding his medical conclusions was reasonable under the circumstances.  Upon review of the record, the Court finds, not unlike O'Brien, that Dr. Cox's direct examination testimony was meticulous and rather lengthy.  Dr. Cox reviewed for the jury the location and color of each contusion, laceration, and point of hemorrhage he found on Sheila Evans's body.  Clearly, O'Brien sought to avoid a repetition of these details on cross-examination.  Moreover, given the mood of the courtroom as O'Brien depicted it, any undue attempt to distinguish bruising and hemorrhaging of a three-year-old girl caused by a finger, from that which would have been caused by a penis may have seemed disrespectful.  The Court finds that counsel did not act unreasonably when he chose not to cross-examine Dr. Cox more extensively on this point and to use other, less potentially volatile, opportunities to argue the legal consequences of the distinction between digital penetration and rape.

On the issue of Dr. Cox's alleged incentive to curry favor with the prosecution by embellishing his testimony regarding the timing of Sheila's rape, habeas counsel conceded that

70

trial counsel were unaware of any basis to question Dr. Cox on that issue.  Thus, habeas

counsel's contention was not that trial counsel failed to make use of information available to it to

attack Dr. Cox's credibility, but that counsel should have, but did not, investigate Dr. Cox's

background sufficiently before his examination commenced so as to uncover fodder for such an

attack.  As discussed above, however, Phillips has no available evidence to develop this claim

because the evidence he now proffers in support of it was never presented to the state courts and

he has not shown that, despite diligent efforts, he was prevented from doing so.  See 28 U.S.C. §

2254(e)(1).  Also as noted above, moreover, given the tangential nature of this alleged bias

evidence, Dr. Cox's substantial medical credentials, and the other substantial evidence of

Phillips's guilt, Phillips can not show that he was prejudiced by any failure to uncover or make

use of this personal information about Dr. Cox.

### E. Seventh and Eighth Grounds for Relief

Phillips contends that the trial court improperly admitted several gruesome slides and

photographs that prejudiced the jury against him.  Specifically, he argues that photographs and

slides depicting Sheila in the emergency room, during her surgery, and during the autopsy offered

little probative value in conjunction with the medical testimony the State adduced during trial

and should not have been admitted.  Moreover, Phillips asserts, the trial court used an improper

standard in admitting this evidence.  Instead of utilizing the standard for admission of evidence

pertinent to capital defendants as required by State v. Mauer, 473 N.E.2d 768 (Ohio 1984), in

which the State must prove that the prejudice to the defendant is "substantially outweighed" by

the danger of unfair prejudice, the trial court followed its admissibility rulings from the Fae

71

Evans trial.  In that trial, the admissibility standard was Ohio Rule of Evidence 403(A).[20]

The Respondent asserts that ground for relief seven is procedurally defaulted.  She claims that, though Phillips raised and received a ruling on the merits for this claim on direct appeal, he raised it again in post-conviction proceedings.  The Ohio Court of Appeals held that the claim was barred on grounds of res judicata.[21]  Thus, this claim appears to be procedurally defaulted. Ylst v. Nunnemaker, 501 U.S. 797, 805 (1991); Combs v. Coyle, 205 F.3d 269, 275 (6th Cir. 2000).

Both the seventh and eighth grounds for relief are without merit regardless of their defaulted status.  The United States Supreme Court has long held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions" such as evidentiary issues.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.  Estelle, 502 U.S. at 68 (citations omitted); 28 U.S.C. § 2254(a).  The job of a federal court addressing state evidentiary issues is limited to a determination whether the admission of evidence at issue violated the petitioner's right to due process and a fair trial.  Id.  A trial may be deemed fundamentally unfair if it can be shown by a

---

[20]     Ohio Rule of Evidence 403(A) states:
> **(A) Exclusion mandatory**
>> Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
Ohio R. Evid. 403(A).

[21]     In State v. Perry, 226 N.E.2d 104 (Ohio 1967), the Ohio Supreme Court held that any claim that was raised or could have been raised on direct appeal is barred from review on post conviction relief under the doctrine of res judicata.

reasonable probability that the outcome would have been different without admission of the evidence or if there is a basis upon which to conclude that the result was unreliable.  <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 370 (1993).  The <u>Estelle</u> Court noted that the category of infractions that violate fundamental fairness is a narrow one.  <u>Id.</u>  (*citing* <u>Dowling v. United States</u>, 493 U.S. 342, 352 (1990)).

On direct appeal, the Ohio Supreme Court addressed this issue pursuant to Ohio law. It found that the trial court did not abuse its discretion in admitting the slides and photographs. Its reasoning is set forth below:

> The same photographs that were introduced in this case had also been introduced during the trial of Sheila's mother, Fae Evans. Appellant asserts that the trial judge in this action, who also presided over Evans's trial, admitted the photographs in the instant case simply because he had admitted them in Evans's. Appellant specifically points to a portion of the transcript which reveals that in discussing the admissibility of the photographs in this case, the trial judge seemed to rely on his previous ruling in Evans's case to support his ruling in appellant's case. While this comment standing alone appears to support appellant's position, it does not do so when viewed in context. Upon a thorough review of the complete record, we are satisfied that the trial court performed the necessary review prior to deeming the photographs admissible.

> Appellant also challenges the admission of the slides into evidence on the basis that they were hideous visual aids which converted "scientific analysis into a horror story." The photographs simply depicted the actual condition of three-year-old Sheila as she appeared in the hospital. As such, they provided the most accurate account of Sheila's extensive injuries.

> During his videotaped deposition, Dr. Klein testified concerning the events that occurred when Sheila was first admitted to Children's Hospital. To facilitate the presentation of his testimony, Dr. Klein referred to eleven color slides that had been taken at the hospital. He used the slides to describe Sheila's injuries, to explain the type of medical procedures that were used in the emergency room, and to support his expert conclusion that Sheila had been anally penetrated by a penis. The probative value of these photographs far outweighed any prejudicial impact they may have had on the jury. Further, they were neither repetitive nor cumulative, and thus were properly admitted.

With respect to Dr. Cox's testimony, appellant attacks the state's introduction of photographs during the coroner's testimony, even though he had already illustrated his testimony with diagrams. While describing Sheila's injuries, Dr. Cox initially referred to drawings that he had prepared, which indicated the location and the number of bruises found on Sheila's body. Given that there were more than one hundred twenty-five such bruises and that many of them overlapped one another, Dr. Cox necessarily used several such diagrams to fully portray the extent of the girl's external injuries. Thereafter, the state introduced fifty-one color slides to further illustrate Dr. Cox's testimony. In relation to Sheila's external injuries, the photographs accomplished what the diagrams could not: they accurately depicted the color of each bruise, which was essential to identify the age of the bruises. The photographs of Sheila's internal injuries directly related to Dr. Cox's expert conclusions concerning the cause of death. Additionally, the pictures of Sheila's anal injuries supported Dr. Cox's determination that the child had been repeatedly penetrated, most recently within a few hours of her death. Therefore, we find that these pictures were neither cumulative nor repetitive, and that their probative value far outweighed any possible prejudice to the defendant.

Among the fifty-one slides used by Dr. Cox, appellant specifically takes issue with the admission of three autopsy photos which provided different views of Sheila's skull. Appellant asserts that these slides were not relevant because "no evidence was introduced which tied any head injury to the cause of death * * *." This statement is incorrect. The challenged photos accompanied Dr. Cox's testimony concerning the presence of brain hemorrhaging and swelling, each of which contributed to Sheila's death. Thus, these three pictures carried significant probative value warranting admission into evidence.

Finally, appellant argues that the use of three specific slides during both Dr. Klein's and Dr. Izsak's testimony rendered them cumulative and thus inadmissible. Simply using a select number of the same exhibits during the testimony of two different witnesses does not transform them into inadmissible cumulative evidence. Each physician in this case provided independent and different testimony, which happened to be aided by some of the same photographs.

Upon thorough review of the sixty-two photographs and the relevant testimony which accompanied the introduction of each, we find that the trial judge acted well within the bounds of his discretion in admitting the photos. The pictures appropriately portrayed the actual condition of Sheila at the time that she was admitted to the hospital and following her death with respect to the massive external and internal injuries she sustained. None of the slides was repetitive. The probative value of each photo clearly outweighed any potential prejudice to the defendant. Appellant's first proposition of law is, therefore, overruled.

Phillips, 656 N.E.2d at 653-54.

Because a habeas court need only review these types of claims for due process violations, the Court need not determine whether the Ohio Supreme Court applied Ohio law correctly in rendering its decision.  Instead, the Court reviews the Ohio Supreme Court's opinion and finds that the reasons it provides for the admission of the photographs and slides is sound.  Based on this reasoning, the Court finds that Phillips was not denied due process by the admission of the photographs and slides because they were sufficiently probative of the testimony provided by the State's medical experts.  Thus, pursuant to the <u>Lockhart</u> holding, there is no basis on which to conclude that the result of Phillip's trial was unreliable.  Grounds for relief seven and eight are without merit.

### F. Ninth Ground for Relief

In this ground for relief, Phillips asserts prosecutorial misconduct pervaded both the culpability and mitigation phases of his trial.  He argues that the prosecution improperly stated that Dr. Cox's testimony was uncontraverted and misled the jury about Phillips's specific intent to kill.  Phillips also claims that the prosecution committed error by introducing victim impact evidence and non-statutory aggravating factors.  He also contends that the prosecution denigrated his unsworn statement and diminished the jury's sense of responsibility during the mitigation phase of trial.

The Respondent asserts that this claim is procedurally defaulted because Phillips did not object to any of the prosecutors' statements during trial.  Consequently, the Ohio Supreme Court reviewed these claims for plain error on direct appeal.  Ohio courts have determined that a failure to contemporaneously object to an alleged error constitutes procedural default.  <u>State v. Williams</u>, 364 N.E.2d 1364 (Ohio 1977).  If a defendant fails to object to a trial error that would

75

affect a substantial right, then the appellate courts will conduct a plain error analysis of that claim.  State v. Slagle, 605 N.E.2d 916, 925 (Ohio 1992).[22]  While Phillips concedes that the Ohio Supreme Court noted the lack of contemporaneous objection to the prosecution's statements, he contends that the Ohio Supreme Court waived plain error and reviewed his prosecutorial misconduct claims on the merits.  Thus, he argues, this Court may conduct a similar type of review.  The Court disagrees.  While Phillips is correct that the Ohio Supreme Court addressed each of his prosecutorial misconduct claims on the merits, it did so only while reviewing the claims for plain error.  In Seymour v. Walker, 224 F.3d 542, 557 (6th Cir. 2000), the Sixth Circuit explicitly rejected Phillips's assertion, stating "[c]ontrolling precedent in our circuit indicates that plain error review does not constitute a waiver of state procedural default rules."  Thus, the Ohio Supreme Court's alternative holding on the merits does not excuse Phillips's failure to contemporaneously object to the prosecutor's statements during trial.  Accordingly, the Court finds these claims to be procedurally defaulted.

Phillips's prosecutorial misconduct claims lack merit in any event.  To assert a successful prosecutorial misconduct claim in a habeas proceeding it "is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181 (1986)(quoting Donnelly v.

---

[22]Additionally, Ohio Rule of Criminal Procedure 52(B) states:

> **(B) Plain error**
> Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

DeChristoforo, 416 U.S. 637, 642 (1974)).  This question must be answered in light of the

totality of the circumstances in the case.  Lundy v. Campbell, 888 F.2d 467, 473 (6th Cir. 1989),

cert. denied, 495 U.S. 950 (1990).  The prosecutor's comments must be so egregious as to render

the trial fundamentally unfair.  Fussell v. Morris, 884 F.2d 579 (6th Cir. 1989)(Table), 1989 WL

100857, at *4 (6th Cir. Sept. 1, 1989).

The Sixth Circuit held in Boyle v. Million, 201 F.3d 711 (6th Cir. 2000), that a district

court should first determine whether the challenged statements were, in fact, improper, and if so,

to determine whether the comments were "flagrant," thus requiring reversal.  Id. at 717.

Flagrancy is determined by an examination of four factors: 1) whether the statements tended to

mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a

series of improper statements; 3) whether the statements were deliberately or accidentally before

the jury; and 4) the total strength of evidence against the accused.  Id. (internal quotation marks

and citation omitted).

Here, as the Ohio Supreme Court observed, the prosecutor's characterization of Dr. Cox's

evidence as "uncontroverted" was correct because other medical professionals did not form an

opinion regarding the time of the rape.  The prosecutor also correctly pointed out that Phillips's

statement was the only evidence suggesting that the rapes did not occur on January 18.

Moreover, it was fair for the prosecutor to assert during closing argument that the jury could infer

that Phillips had an intent to kill based on the condition of Sheila's body.   Finally, prosecutors

are permitted, pursuant to Ohio law, to note that a criminal defendant's unsworn statement is not

subject to cross-examination.

Contrary to Phillips's assertions, as held by the Ohio Supreme Court, the prosecution

77

neither diminished the jury's responsibility in imposing a sentence nor misled the jury about the nature of mitigating evidence.  Phillips, 656 N.E.2d at 662.  These alleged misstatements were also isolated and unlikely to confuse the jury.  Boyle, 201 F.3d at 717.  Thus, Phillips's ninth ground for relief lacks merit.

### G. Tenth, Eleventh, and Twelfth Grounds for Relief

Phillips maintains in these grounds for relief that he was not present during critical phases of the trial.  Specifically, he asserts that neither he nor his counsel were present when the trial court responded to two questions from the jury during guilt phase deliberations.  He also asserts that he was denied the right to be present during his arraignment, which was conducted via closed circuit television.  Finally, he contends that the videotaped testimony of Dr. Klein violated his Confrontation Clause rights.  All three claims are procedurally defaulted because, when Phillips raised them on direct appeal to the Ohio Supreme Court, the court reviewed them for plain error as Phillips did not raise them to the court of appeals.  State v. Phillips, 656 N.E.2d 643, 663 (Ohio 1995).  As stated above, a state court may make an alternative ruling when reviewing for plain error without removing the procedural bar, thereby preventing a federal habeas court's review on the merits.  Seymour v. Walker, 224 F.3d 542, 557 (6th Cir. 2000).  Thus, these claims are procedurally defaulted despite the Ohio Supreme Court's review of them.

These claims would not be well-taken in any event.  In United States v. Gagnon, 470 U.S. 522 (1985), the United States Supreme Court held that

> [a] criminal defendant has the right to be present at any proceeding whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge. . . . [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.

78

Id. at 526 (*quoting* Snyder v. Massachusetts, 291 U.S. 97, 105-06 (1934))(internal quotation marks omitted).  If a federal habeas court determines that error occurred and the defendant was excluded from a critical phase of the trial, the court must then determine whether such error was harmless or prejudicial to the defendant.  Rushen v. Spain, 464 U.S. 114, 119-20 (1983).

### 1. Tenth Ground for Relief

Phillips asserts he is entitled to habeas relief because he was not present when the judge responded to two questions from the jury during its guilt-phase deliberations.  At that point in its deliberations, the jury submitted two questions to the trial court requesting additional instructions regarding the definitions of "aggravated murder" and "specifications."  He also contends that the trial court caused his counsel to be ineffective because they were not present at this critical juncture.  Phillips raised the ineffective assistance portion of his claim during for the first time during post-conviction proceedings, but the court rejected it on procedural grounds.

Phillips maintains that the post-conviction court erred when holding that his ineffective assistance claim was barred on grounds of res judicata.  Because Phillips presented this claim for the first time during post-conviction proceedings and supported it with evidence outside the record, he insists, this claim was preserved for federal habeas review.  When he raised this claim in his post-conviction petition, he attached affidavits from his trial counsel stating that they were neither aware that the jury had asked questions nor were present in the court when the trial court responded to them.  The Court declines to determine whether, pursuant to Ohio law, these affidavits were sufficient evidence *de hors* the record for the post-conviction court to address this claim during those proceedings.   Instead, the Court addresses the merits of Phillips's claim but finds it to be not well-taken.

79

Phillips cites to <u>French v. Jones</u>, 332 F.3d 430 (6th Cir. 2003), to support his assertion that he was denied the right to be present and the right to counsel at a critical stage of his trial proceedings.  In <u>French</u>, the Sixth Circuit held that a habeas petitioner was entitled to relief because his counsel was not present when the trial court provided his deadlocked jury with a supplemental instruction.  Finding that the uncertainty of whether the petitioner suffered prejudice rendered the outcome of the trial unreliable, the Court held that the petitioner's Sixth Amendment right to counsel was violated because counsel were absent from this critical point of his trial.  <u>Id.</u> at 438.

This case is clearly distinguishable from <u>Jones</u>, in which all parties acknowledged that the trial court had furnished the jury with additional instructions outside the petitioner or his counsel's presence.  Here, it is unclear from the habeas record whether the trial judge did, in fact, provide the jury with additional information regarding the definitions of "aggravated murder" and "specifications."  During habeas proceedings, this Court permitted habeas counsel to present interrogatories to Summit County Common Pleas Judge James R. Williams regarding his recollection of whether the jury submitted any questions to him during their guilt-phase deliberations and, if so, what was his response to them.  He responded that, although he had no specific recollection of this event, he presumed that he followed his customary practice of providing the jury with a copy of the written instructions he previously had read to them and, thus, had <u>not</u> likely provided supplemental instruction to them.  (Doc. No. 70, Tab 1, at 2).  Additionally, when reviewing this claim on direct appeal, the Ohio Supreme Court observed that "the record does not reveal that the judge actually responded to the jurors' questions."  <u>Phillips</u>, 656 N.E.2d at 663.

80

When holding that this claim lacked merit, the Ohio Supreme Court presumed, pursuant to state law, that the proceedings were regular absent any indication to the contrary in the record. Concluding that Phillips "fail[ed] to offer any indication to explain how this court should determine that any unrecorded proceedings took place," it overruled Phillips's proposition of law. Id.

While the Court is reluctant to dispense with this ground for relief merely because there was no record made to support it, it cannot find that the Ohio Supreme Court's decision to deny the claim was an unreasonable one. As that court noted, there is no support for Phillips's claim that the trial court responded to the jury's questions with supplemental instructions. Moreover, even if the trial court did respond to the jury, it is likely, as Judge Williams stated, that he merely referred the jury back to the written instructions he previously had read to them. Under the dictates of Rushen, the Court finds that, even if Phillips was absent when Judge Williams referred  the jury back to the written instructions, that absence did not prejudice the outcome of the trial as the trial court took no substantive action and provided no supplemental information to the jury during that absence. Accordingly, Phillips's tenth ground for relief is not well-taken.

### 2. Eleventh Ground for Relief

Phillips argues in this ground that he is entitled to habeas relief because he was arraigned via closed circuit television. At that time, Phillips plead not guilty to all charges. The Ohio Supreme Court found this claim to be waived on two grounds. First, it held that Phillips failed to raise it to the court of appeals. Second, the Ohio Supreme Court found Phillips waived all but a plain error review because he did not object to a closed circuit television arraignment during trial.

81

<u>Phillips</u>, 656 N.E.2d at 663. When reviewing this claim for plain error on direct appeal, the Ohio

Supreme Court held that Phillips's arraignment comported with Supreme Court precedent

regarding his due process and confrontation clause rights.  It held:

> The United States Supreme Court has long recognized that the accused has a right
> to be present at every critical stage of the proceedings against him or her.
> <u>Kentucky v. Stincer</u> (1987), 482 U.S. 730, 745; <u>Snyder v. Massachusetts</u> (1934),
> 291 U.S. 97.  Due process requires a defendant's presence only "to the extent that
> a fair and just hearing would be thwarted by his absence." <u>Id.</u> at 108. Far from a
> mere formalism, arraignment is a stage important enough to entitle the accused to
> the presence of counsel. <u>Kirby v. Illinois</u> (1972), 406 U.S. 682.  Nevertheless,
> arraignment is not a procedure required by the Due Process Clause of the Fifth
> Amendment. <u>Garland v. Washington</u> (1914), 232 U.S. 642, 645; <u>see</u> <u>United States
> v. Coffman</u> (C.A.10, 1977), 567 F.2d 960.  Nor is the Sixth Amendment right to
> confront witnesses implicated because there are no witnesses involved at that
> stage. <u>Snyder</u>, <u>supra</u>, 291 U.S. at 106-107.  Moreover, the United States Supreme
> Court has held that closed-circuit television may satisfy the Confrontation Clause
> in limited circumstances. <u>Maryland v. Craig</u> (1990), 497 U.S. 836, 851 (use of
> closed-circuit television is permitted for taking testimony of child witnesses so
> long as the teleconferencing procedure is "functionally equivalent to that accorded
> live, in-person testimony").

<u>Phillips</u>, 656 N.E.2d at 663-64 (parallel citations and footnotes omitted).  Thus, the Ohio

Supreme Court identified the principal Confrontation Clause and Due Process Clause precedent

on this issue.

When addressing Phillips's specific claim, the court also observed that the manner in

which the arraignment was conducted was not prejudicial to him.  It noted that "the trial judge

asked [Phillips] if he was able to hear and see the proceedings, to which [Phillips] responded that

he could."  Accordingly, the Ohio Supreme Court reasoned that closed-circuit television was

constitutionally adequate when the procedure was the functional equivalent of a live, in-person

arraignment.  <u>Id.</u> at 664.

The Ohio Supreme Court's application of United States Supreme Court precedent was

82

not an unreasonable one.  While it recognized the importance of the arraignment proceeding, it also remarked that the United States Supreme Court has permitted the use of closed-circuit television in some trial proceedings.  Id.  Finding that Phillips's arraignment was the practical equivalent of an in-person arraignment because of his ability to interact with the trial court and his counsel, it held that the arraignment met the Confrontation Clause and Due Process Clause requirements of the Constitution.  The Court finds this reasoning to be sound and in compliance with United States Supreme Court precedent.  Thus, pursuant to 28 U.S.C. § 2254(d), its inquiry ends.[23]

### 3. Twelfth Ground for Relief

Finally, Phillips asserts he was denied the right to confront witnesses when the State introduced the video-taped testimony of Dr. Klein during trial.   Phillips also complains that the State did not provide a reason for Dr. Klein's unavailability before playing the deposition testimony for the jury's review.  As with ground for relief eleven, the Ohio Supreme Court not only rejected this claim based on Phillips's failure to raise it before the court of appeals, but also because he failed to object to Dr. Klein's video-taped testimony at any point prior to or during trial.  Thus, this claim is procedurally defaulted.

It is also without merit.  When conducting its plain error review, the Ohio Supreme Court found that this claim lacked merit because Phillips was physically present at Dr. Klein's deposition.  It concluded that, "[i]t is irrelevant that the face-to-face confrontation occurred during the deposition rather than during trial.  What is important is that the confrontation

---

[23]     The Ohio Supreme Court also analyzed this claim pursuant to Ohio Rule of Criminal Procedure 10(B).  Because that rule pertains only to state law, this Court will not review the court's analysis on that ground.

83

occurred as Dr. Klein testified, since a witness is less likely to lie, or to lie convincingly, in the physical presence of the accused." <u>Phillips</u>, 656 N.E.2d at 665.  It also held that, despite Phillips's assertion, the State raised the issue of Dr. Klein's unavailability during a pre-trial motion.

Phillips cannot argue that his Confrontation Clause right was denied merely because he confronted Dr. Klein at his actual deposition, rather than during trial.  Because Phillips was not denied the right to confront Dr. Klein, contrary to his assertions, the Court finds the Ohio Supreme Court's decision finding no plain error was not an unreasonable one or contrary to any United States Supreme Court precedent.

### H. Thirteenth Ground for Relief

Phillips's thirteenth ground is that the trial court erred in ruling that his confession to the Akron Police Department was voluntary.  He claims that, because of the pressure placed on him during his interrogation, the confession that it produced violated his Fifth Amendment rights. The Respondent concedes that this claim is not procedurally defaulted as Phillips raised it to the Ohio Supreme Court, which addressed it on the merits.

That court found that, in accordance with the findings of the trial court after a suppression hearing, Philips's confession was not coerced.  It opined as follows:

> In his ninth proposition of law, appellant contends that his statements to the police concerning his involvement with Sheila's death were involuntary, and thus should have been suppressed. Specifically, appellant points to his youth and the "oppressive environment" in which he was interrogated as evidence that his confessions, both oral and written, were coerced.
>
> During a suppression hearing, Detective Perella testified that on January 18, 1993, appellant agreed to go to the police station for questioning, but that he was not arrested at that time. Detective Falcone testified that he interviewed appellant at police headquarters, during which time appellant was neither handcuffed nor

84

restrained in any way. Appellant was placed in a small interview room, but the door remained unlocked throughout the questioning. Falcone read appellant his Miranda warnings, which appellant stated he understood. The officers observed appellant to be literate, alert, and free of any influence from drugs or alcohol. When asked if he wished to speak to the police concerning the events that led to Sheila's beating, appellant executed a form in which he agreed to answer questions and acknowledged that no promises, threats, pressure or coercion were used to obtain his cooperation. Throughout the seven-hour interview, appellant was provided with food and occasional breaks.

Perella testified that the second round of questioning occurred as a result of appellant's phone call to police headquarters indicating that he wished to speak with the officers assigned to Sheila's case. On January 20, 1993, appellant agreed to be transported to the police station, where he was again taken to an interview room and read his Miranda rights. He said he understood those rights and signed another waiver. Perella and another officer interviewed appellant for approximately two hours, at the end of which he prepared a written confession. That confession states at the end: "I willingly and freely give this statement to Det. Perella For help or counsel. R.P."

During the suppression hearing, appellant claimed that he was locked in the interview room during his first meeting with police on January 18, although he admitted that no one had said he could not leave the detective bureau. Appellant also asserted that he did not call the police station on January 19, with an offer to talk with the detectives. Rather, appellant said that the police picked him up at his school on January 20, arrested and handcuffed him, and then locked him in the interview room. According to appellant, Perella refused to permit him to make a telephone call and told him that he "was not entitled to talk to a lawyer." Appellant denied either writing or signing the confession. He claimed that Perella told him that if he produced a written statement, Perella would see that he "got some kind of help."

The trial judge orally denied appellant's motion to suppress without formal findings or a journal entry, but he did state that he believed Detective Perella's testimony "that he did not make any promises in order to get a statement from Mr. Phillips." The record supports denial of the motion. In State v. Barker (1978), 372 N.E.2d 1324, paragraph two of the syllabus, this court determined that "[i]n deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." The totality of circumstances surrounding appellant's two interviews with police fails to sustain the contention that appellant's confession was involuntary. Appellant has not shown that the police

85

used inherently coercive tactics which led him to confess.  See, e.g., State v. Cooey (1989), 544 N.E.2d 895; State v. Clark, supra, 527 N.E.2d at 854.  Therefore, the ninth proposition is overruled.

State v. Phillips, 656 N.E.2d at 666.

Although the Ohio Supreme Court did not cite to the primary United States Supreme Court cases such as, Schneckloth v. Bustamonte, 412 U.S. 218, 223-27 (1973), which held that a reviewing court must look to the totality of the circumstances to determine whether a confession was voluntary, it cited to the state law analogue, State v. Barker, 372 N.E.2d 1324 (Ohio 1978).[24] Thus, it correctly identified the coerced confession test as enunciated by the United States Supreme Court.  Moreover, it accepted the testimony of Akron Police Detective Perella when it determined that Phillips could exit the interview at any point, was not subject to mistreatment, or was not promised anything in return for his confession.  Phillips has not demonstrated that the Ohio Supreme Court's factual findings (which included an acceptance of the trial court's credibility determinations), were "an unreasonable determination of the facts in light of the evidence presented" in the suppression hearing, as he must to obtain habeas relief.  28 U.S.C. § 2254(d)(2).  Thus, this ground for relief is not well-taken.

## I. Fourteenth Ground for Relief

In Phillips's fourteenth ground for relief, he maintains that the trial court erred when it charged the jury on several occasions during both phases of the trial.  Phillips raised these claims on direct appeal to the Ohio Supreme Court, which found that, because he did not

---

[24]    As stated above, the United States Supreme Court has held that a state court need not cite to Supreme Court precedent so long as it does not apply that precedent in an unreasonable fashion.  Early v. Packer, 537 U.S. 3, 8 (2003).

contemporaneously object to these instructions, Phillips waived all but a plain error review of them.  Phillips maintains that the Ohio Supreme Court failed to enforce its ruling of procedural default and addressed the merits of the claims in its opinion.  It is clear from the body of the opinion, however, that the Ohio Supreme Court was merely reviewing each claim for plain error when it analyzed each jury instruction claim.  Thus, the court did not excuse the procedural bar.

Phillips alternatively argues that, even if the Court finds these claims to be procedurally defaulted, he can establish cause and prejudice to excuse the default because his trial counsel were ineffective for failing to object to the jury instructions.  As stated above, courts have held that ineffective assistance of counsel, if proved, is sufficient to satisfy the "cause" prong for excusing procedural default.  Thus, Phillips must demonstrate "that [he] received ineffective assistance of counsel that rose to the level of a violation of [his] Sixth Amendment rights" to successfully characterize counsel's conduct as cause and overcome the procedural default hurdle.  Seymour v. Walker, 224 F.3d 542, 550 (6th Cir. 2000).

Phillips cannot excuse the default of his jury instruction claims.  Because the Court finds below that Phillips's jury instruction claims lack merit, it consequently must determine that Phillips cannot establish the prejudice necessary to demonstrate ineffective assistance of counsel.  Thus, these claims are procedurally defaulted.

To obtain habeas relief for a incorrect jury instruction during trial, a petitioner must demonstrate that the instruction was more than merely undesirable, erroneous, or universally condemned.  Instead, the instruction must violate a constitutional right.  Estelle v. McGuire, 502 U.S. 62, 72 (1991).  A habeas court must determine whether there is a reasonable likelihood that the jury applied the instruction in a way that prevented consideration of constitutionally relevant

87

evidence. Boyd v. California, 494 U.S. 370, 380 (1990). The impropriety of the instruction must be considered in the context of the instructions as a whole and of the entire trial record. Id.

Because jury instruction errors typically are matters of state law, the standard for demonstrating that a jury instruction caused constitutional error in a habeas proceeding "is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 154 (1977). A habeas petitioner's "burden is especially heavy [when] no [affirmatively] erroneous instruction was given . . . . An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Id. at 155.

Phillips first alleges that the trial court erred when defining the term "purpose" under Ohio law. He states that the manner in which the trial court charged the jury created a mandatory rebuttable presumption of intent to kill based on the fact that the victim was beaten to death. In its entire instruction defining the term "purpose," the court charged the jury as follows:

> Purpose to cause the death of another is an essential element of the crime of aggravated murder. A person acts purposely when it is his specific intention to cause a certain result.
> No person may be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another. It must be established in this case that at the time in question there was present in the mind of the Defendant, a specific intention to cause the death of Sheila Marie Evans.
> Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct. The purpose with which a person does an act is determined from the manner in which it is done, the means used and all the other facts and circumstances in evidence.

(Doc. No. 42, at 971-72).

In reviewing this claim for plain error, the Ohio Supreme Court held that the trial court's instruction was sound because it "simply set forth general categories of evidence from which the

jury could determine the purpose of an act."  <u>State v. Phillips</u>, 656 N.E.2d 643, 668 (Ohio 1995).

The Ohio Supreme Court's decision is not clearly contrary to or an unreasonable application of

any United States Supreme Court precedent.  Based on the trial court's instruction, the jury was

told to consider <u>all</u> evidence when determining if Phillips acted with purpose.  Thus, under the

<u>Boyd</u> decision, the jury was told to consider all constitutionally relevant evidence.  Importantly,

moreover, the jury was also told that it could <u>not</u> find that Phillips acted with the requisite

purpose unless it concluded that Phillips acted with the specific intent (<u>i.e.</u>, specific purpose) to

kill Sheila Marie Evans.  Indeed, the trial court reiterated the importance of this concept – <u>i.e.</u>, of

the need to find that Phillips specifically intended to cause the death of this specific child –

several times.  Nothing about the instructions appears to create the presumption Phillips now

reads into it; it was not unreasonable for the Ohio Supreme Court to find the instruction

constitutionally sound.  This sub-claim is not well-taken.

Phillips next takes issue with the definition of "causation," which the trial court defined

in terms of foreseeability because, he asserts, it relieved the State of its burden of showing intent

to kill.  The trial court charged the jury that "cause" in relation to foreseeability was defined as

> an act which in the natural and continuous sequence of events directly produces
> the death and without which the death would not have occurred.
> 　　Cause occurs when death is a natural and foreseeable result of the act.  A
> death is the result of the act when it is produced directly by the act in a natural and
> continuous sequence and would not have occurred without the act.
> 　　Result occurs when the death is naturally and foreseeably caused by the
> act.  There may be more than one cause, however.  If the Defendant's act or
> failure to act was one cause, the existing [sic] of other causes is not a defense in
> this case.  The causal responsibility of the Defendant for an unlawful act is not
> limited to its immediate and most obvious result.  He is responsible for the
> natural, logical, and foreseeable results that follow in the ordinary course of events
> from an unlawful act.
> 　　The test for foreseeability is not whether the Defendant should have
> foreseen the death of Sheila Marie Evans and in its precise form as to her

89

specifically.  The test is whether a reasonably prudent person, in light of all the circumstances, would have anticipated that death was likely to result to someone from the performance of the unlawful act.

(Doc. No. 42, at 972-73).

On direct appeal, the Ohio Supreme Court found no plain error in this instruction because the instruction "as a whole makes clear that the jury must find purpose to kill in order to convict."  Phillips, 656 N.E.2d at 668.  This finding was not an unreasonable one because, when viewing the instructions in their entirety, the jury was not told that it must define cause solely based on the foreseeability of the criminal act.  As discussed above, the trial court repeatedly told the jury of the need to find that Phillips acted with the specific intention to cause the death of Sheila Marie Evans.  It was not unreasonable for the Ohio Supreme Court to find that this particular "causation" instruction, when considered in the context of all of the instructions taken as a whole, did not have the effect, as Phillips claims, of negating the jury's obligation to find that the State had proven that Phillips acted with the requisite specific intent.

Phillips also asserts trial court error because, he claims, the trial court raised the issue of punishment during the guilt-phase instructions.  Quoting this instruction, the Ohio Supreme Court found no plain error:

In the twentieth proposition, appellant asserts that the trial court improperly injected the issue of punishment into the guilt phase of the proceedings. Appellant specifically complains about the following instruction the trial judge gave to the jurors:

"You should not discuss or consider the subject of punishment in your deliberation. Well, actually, I guess, in this case, considering the specification, now, you will be brought back *later*, if, in fact, you make a finding of guilty of aggravated murder and the specification. So on this occurrence, *I guess you're not discussing the matter of punishment* in your deliberation. Your duty is *confined* to determining the guilt or innocence of the accused." (Emphasis added.)

90

> Appellant asserts that this statement created a substantial risk that the jury deliberated on the issue of punishment when they should have been limited to a discussion of guilt or innocence. The clear import of the judge's statement negates appellant's contention. Any reasonable juror would have taken the instruction as a warning not to consider punishment during the guilt phase.

Phillips, 656 N.E.2d at 668-69.  While the trial court's instruction perhaps should have been less rambling, the Ohio Supreme Court's finding is not an unreasonable one.  The upshot of the trial court's instruction was that the jury was not to consider the punishment during the guilt-phase deliberations; given that fact, it is reasonable for the Ohio Supreme Court to conclude that the jury would not have done so.

Finally, Phillips contends the trial court unconstitutionally misled the jury during the penalty phase when it charged them that a sentence of death was only a recommendation.  He claims that this instruction impermissibly alleviated the jury's responsibility in the event that it imposed a death sentence, citing Caldwell v. Mississippi, 472 U.S. 320 (1985).  The Caldwell Court concluded that the defendant's death sentence was unconstitutional, because "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  Id. at 328–29.  Phillips argues that the trial court's instruction impermissibly led the jury to believe that the final responsibility for determining whether to impose a death sentence lay with the judge, and not with the jury itself.

Phillips cannot prevail on this claim because, unlike Caldwell, the trial judge's instructions did not mislead the jury and was an accurate statement of Ohio law.  The Ohio Supreme Court found this instruction did not diminish the jury's sense of responsibility:

> Appellant also contends that the trial court improperly instructed the jury and led the panel to believe that a finding of death would merely constitute a

91

> recommendation to the judge as prohibited by <u>Caldwell v. Mississippi</u> (1985), 472
> U.S. 320, 328-329. This court rejected the same argument in <u>State v. Durr</u> (1991),
> 568 N.E.2d 674, 682, where we determined that " '<u>Caldwell</u> * * * is inapplicable
> where the statements made to the jury during the mitigation phase of a capital trial
> were accurate statements of the law and were not made to induce reliance on the
> appellate process.' " Quoting <u>State v. Rogers</u> (1986), 504 N.E.2d 52, paragraph
> one of the syllabus, reversed and remanded on other grounds (1987), 512 N.E.2d
> 581. The instruction in this case represented an accurate statement of the law and
> was not geared to induce the jury's reliance on the appellate process. <u>See</u>, <u>e.g.</u>,
> <u>State v. Hicks</u> (1989), 538 N.E.2d 1030, 1039.

<u>Phillips</u>, 656 N.E.2d at 669 (parallel citations omitted).  Because the Ohio Supreme Court did not

apply <u>Caldwell</u> unreasonably, this sub-claim is not well-taken.

### J. Fifteenth, Sixteenth, Eighteenth, Nineteenth, Twentieth, Twenty-First and Twenty-Second Grounds for Relief

In these grounds for relief, Phillips asserts that Ohio's death penalty statutes are

unconstitutional either on their face or as the trial court enforced them during his trial.  Because

they all have this issue in common, the Court groups them together here and addresses them

below.

### 1. Fifteenth Ground for Relief

Phillips alleges in his fifteenth ground for relief that the mitigating factors defined by

Ohio law pursuant to Ohio Revised Code § 2929.04(B)(7) and as charged to the jury at his trial

are misleading and created a substantial risk that the jury would impose a death sentence.  The

Respondent asserts that this claim is procedurally defaulted.  On direct appeal, the Ohio Supreme

Court held that Phillips had waived this claim because, while he contemporaneously objected to

this instruction during trial, he did not raise it in the court of appeals.  <u>Phillips</u>, 656 N.E.2d at

669.  Phillips does not successfully demonstrate cause and prejudice or a miscarriage of justice to

excuse this default. Thus, the Court finds this claim to be procedurally defaulted.[25]

### 2. Sixteenth Ground for Relief

In his sixteenth ground for relief Phillips argues that Ohio's statutory definition of reasonable doubt is unconstitutional. He claims that the trial court impermissibly permitted the jury to convict and sentence on a burden of less than reasonable doubt when it charged the jury on their burden of proof at the close of both the guilt and mitigation phases of trial.[26] The Ohio Supreme Court found that Phillips waived this claim because he did not raise it in the court of

---

[25]    This claim is without merit in any event. During trial, the court instructed the jury in accordance with § 2929.04(B)(7) that it should consider "any factors that are relevant to the issue of whether the offender should be sentenced to death." (Doc. No. 43, at 165). Phillips asserts that the emphasis on the sentence of death creates a risk that the jury will focus on issuing that sentence rather than finding factors for imposing a life sentence, thereby creating a non-statutory aggravating factor.

   The Ohio Supreme Court rejected this claim on direct appeal. It held that the trial court's instruction did not constitute plain error because "the jury was specifically told that (B)(7) factors are *mitigating*." Phillips, 656 N.E.2d at 669 (emphasis in the original). It concluded that the jurors "could not have reasonably construed that as an invitation to consider nonstatutory aggravation." Id. This logic is sound and not contrary to any Supreme Court precedent. Phillips is hard pressed to prove that jurors who were read a list of mitigating factors could construe one as a non-statutory aggravating factor.

[26]    The trial court charged the jury by reading the statutory definition of reasonable doubt provided by Ohio Revised Code § 2901.05. That statute states:

   (D) "Reasonable doubt" is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. "Proof beyond a reasonable doubt" is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

Ohio Rev. Code § 2901.05(D); (Doc. No. 42, at 970).

appeals.  Thus, this claim is procedurally defaulted[27]

### 3. Eighteenth Ground for Relief

Phillips's eighteenth ground for relief is that Ohio's death penalty statutes are unconstitutional because the aggravating factor merely duplicates an element of felony murder. The Respondent does not allege that this claim is procedurally defaulted because the Ohio Supreme Court summarily addressed it on direct appeal.  It is, however, without merit.

The Supreme Court has articulated clearly the constitutional mandates for imposing the death penalty.  In Lockett v. Ohio, 438 U.S. 586 (1978), the Court held that any death penalty statute must allow the sentencer to review all mitigating evidence during the penalty phase, thereby fashioning a sentence befitting the individual defendant.  Because death "is so profoundly different from all other penalties," the Court reasoned, it cannot be imposed without individualizing the sentence.  Id. at 605.  The Court further refined the statutory limiting requirement in Zant v. Stephens, 462 U.S. 862 (1983).  In that case, the Court concluded that any death penalty statute must narrow the class of death-eligible defendants from those not death eligible.  Id. at 177.  Specifically, a state may choose either to legislatively limit the definition of death-eligible crimes, or it may broadly define capital offenses but narrow the defendants who

---

[27]     Were this Court to address the merits of this claim, moreover, it would not find it to be well-taken.  The Sixth Circuit has ruled expressly that Ohio's statutory definition of reasonable doubt does not offend due process.  Scott v. Mitchell, 209 F.3d 854, 884 (6th Cir. 2000)(citing Thomas v. Arn, 704 F.2d 865, 867–69 (6th Cir. 1983)).  To offend due process, the instruction must be of the type that could mislead the jury into finding no reasonable doubt when in fact there was some.  Scott, 209 F.3d at 868; Holland v. United States, 348 U.S. 121, 140 (1954). In the present case, the trial court read the very statutory jury instruction that this Circuit has already found to be constitutional.  Nothing Phillips now argues could justify a decision by this Court that ignores controlling precedent.

actually receive a death sentence by using aggravating circumstances during the penalty phase.
Lowenfield v. Phelps, 484 U.S. 231, 246 (1987).

Ohio's death penalty scheme complies with these mandates.  First, §§ 2929.04(B) and (C)
allow the defendant to present, and the fact finder to consider, all statutorily enumerated
mitigating factors.  Moreover, § 2929.04(B)(7) permits a fact finder to consider all mitigating
factors in addition to those enumerated in the statute.  Finally, the Ohio death penalty scheme
satisfies the Zant requirements by demanding the fact finder to find the existence of at least one
aggravating circumstance set forth in § 2929.04(A).

### 4. Nineteenth Ground for Relief

Phillips's nineteenth ground for relief is aimed at the structure of Ohio's capital
punishment scheme.  In this claim, Phillips asserts that Ohio's capital punishment scheme is
unconstitutional on its face.  The Court is not persuaded by Phillips's allegations.  In summary
fashion, and regardless of defaulted status, the Court will list below Phillips's allegations, in
italics, and thereafter state the reasons they are unpersuasive.

• *The death penalty violates the Eighth Amendment prohibition against cruel and unusual
punishment.*  This argument was rejected in Gregg v. Georgia, 428 U.S. 153
(1976)(holding death penalty *per se* not constitutionally barred).

• *Ohio's scheme is unconstitutionally arbitrary because it allows for prosecutorial
discretion to determine whether to seek a capital indictment.*  The Supreme Court in
Gregg v. Georgia, 428 U.S. 153 (1976), rejected this argument under a similar death
penalty statute, condoning the discretionary system.

• *Ohio's scheme is unconstitutional because it is imposed in a racially discriminatory
manner.*  Phillips alleges that those who are racial minorities or who kill whites are more
likely to receive the death penalty.  Pursuant to McClesky v. Kemp, 481 U.S. 279 (1987),
a capital defendant cannot evade a death sentence merely by demonstrating the statistical
disparity of capital defendants or victims of a particular race.  Instead, the capital
defendant must prove that the decision maker in his or her individual case acted with a
discriminatory purpose, and that such actions had a discriminatory effect on the

95

proceeding. Id. at 292. As Phillips has not asserted discrimination occurred during his sentencing, this claim must fail.

- *Ohio's scheme is not the least restrictive means of effectuating deterrence.* Once again, the Supreme Court addressed this exact point in Gregg v. Georgia, 428 U.S. 153 (1976). Noting that imposing criminal punishment is a legislative responsibility, the Court limited its own ability to "require the legislature to select the least severe penalty possible." Id. at 175.

- *Ohio's scheme is unconstitutional because it fails to require the jury to find a conscious desire to kill or specific intent to kill.* This argument is groundless as § 2903.01(E) requires no person to be convicted of aggravated murder unless he or she is "specifically found to have intended to cause the death of another . . . ." Moreover, the Supreme Court sanctioned the use of a criminal state of mind less culpable than intent, i.e., reckless indifference, as an acceptable level of culpability to impose the death penalty. See Tison v. Arizona, 481 U.S. 137, 156 (1986)(affirming death sentence of capital defendant who took part in prison escape but was not present when murder of kidnaped family occurred because he possessed a "reckless disregard for human life.").

- *Ohio's scheme is unconstitutional because it fails to require proof beyond all doubt.* The Supreme Court explicitly rejected this argument in In re Winship, 397 U.S. 358, 364 (1970), where it stated that the standard required to convict a criminal defendant is "proof beyond a reasonable doubt."

- *Ohio's scheme is unconstitutional because it fails to set a standard for the jury for balancing mitigating factors with aggravating circumstances.* The United States Supreme Court has determined that a state is not required to give the jury guidance as to its weighing and consideration of the evidence adduced during the mitigation phase. Buchanan v. Angelone, 522 U.S. 269 (1998).

- *Ohio's scheme is unconstitutional because it requires the jury to find an aggravating factor during the guilt phase of trial.* The Court addressed this argument in Phillips's eighteenth ground for relief and will not re-address it here.

- *Ohio's scheme is unconstitutional because it imposes a risk of death on those capital defendants who choose to exercise their right to trial.* In United States v. Jackson, 390 U.S. 570, 582 (1968), the Supreme Court determined that a legislative body cannot produce a chilling effect on a defendant's Fifth Amendment right not to plead guilty and Sixth Amendment right to demand a jury trial. In that case, the Court struck down the capital portions of a federal kidnapping statute because it authorized only the jury to impose the death sentence. Conversely, in Ohio "a sentence of death is possible whether a defendant pleads to the offense or is found guilty after a trial." State v. Buell, 489 N.E.2d 795, 808 (Ohio 1986). Consequently, the Ohio scheme comports with constitutional mandates.

• *Ohio's scheme is unconstitutional because it requires that the pre-sentence report be submitted to the jury once the defendant requests it.*  Although the Fifth Amendment would be violated if a court <u>orders</u> a defendant to undergo a psychiatric examination, without informing the defendant that his statements can be used against him, and then admits his statements into evidence during the sentencing phase in order to prove statutory aggravating circumstances, <u>see</u> <u>Estelle v. Smith</u>, 451 U.S. 454 (1981), the Fifth Amendment will not be violated if the defendant requests the psychiatric evaluation himself.  This reasoning is explained in <u>Buchanan v. Kentucky</u>, 483 U.S. 402 (1987):

> A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding.  This statement leads logically to another proposition: if a defendant requests such an evaluation or presents psychiatric evidence of such an evaluation, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested.  The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

<u>Id.</u> (citations omitted).

• *Ohio's scheme is unconstitutional because it inadequately tracks cases reviewed when determining the proportionality of the sentence.*  The Court will address this argument in Phillips's twentieth ground for relief.

• *Ohio's scheme is unconstitutional because a three-judge panel is not required to identify and articulate the existence of mitigating factors and aggravating circumstances.*  While the Supreme Court does "require that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed," <u>Gardner v. Florida</u>, 420 U.S. 349, 361 (1977), there is no actual criterion stating that the trial judge must identify and articulate the specific factors used to formulate the decision.  Furthermore, Ohio Revised Code § 2929.03(F) requires that a trial judge make a written finding as to the existence of specific mitigating factors and aggravating circumstances, and why the aggravating circumstances outweigh the mitigating factors.  By making a record of these determinations, the appellate court is able to make an "independent determination of sentence appropriateness."  <u>State v. Buell</u>, 489 N.E.2d 795, 807 (Ohio 1986), <u>cert.</u> <u>denied</u>, 479 U.S. 871 (1986).   Thus, no constitutional infirmity exists.

• *Ohio's scheme is unconstitutional because it fails to require that the State prove that the death penalty is the only appropriate remedy.*  No such constitutional mandate exits.  Moreover, the Ohio scheme provides for an appropriateness review on direct appeal.

• *Ohio's scheme is unconstitutional because it fails to provide the sentencing authority*

97

*with an option to impose a life sentence when it finds that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.*  The Supreme Court rejected the identical argument in <u>Blystone v. Pennsylvania</u>, 494 U.S. 299 (1990).

• *Imposition of the death penalty is a violation of international treaties.*  The Sixth Circuit has held in an Ohio capital habeas case that "Courts have made clear that "[i]nternational law does not require any particular reaction to violations of law.... Whether and how the United States wishes to react to such violations are domestic questions." <u>Buell v. Mitchell</u>, 274 F.3d 337, 375 (6th Cir. 2001)(*quoting* <u>Estate of Ferdinand Marcos</u>, 25 F.3d 1467, 1475 (9th Cir.1994)(further citations omitted).  <u>See also</u> <u>State v. Steffen</u>, No. C-930351, 1994 WL 176906, at *4 (Ohio Ct. App. May 11, 1994)(holding that there was no colorable argument supported by precedent from any human rights forum that the arrest, incarceration, trial, and sentence of an individual violated human norms to which the United States is bound either by customary international law or treaty).

## 5. Twentieth Ground for Relief

Phillips asserts in ground for relief twenty that the Ohio courts conducted an inadequate proportionality review both generally and during his appeal.  Specifically, he asserts that because Fae Evans received a sentence of fourteen to forty years of imprisonment and is now eligible for parole for committing essentially the identical criminal acts, his sentence is disproportionate to the crime he committed.

A proportionality review is not constitutionally required.  <u>Pulley v. Harris</u>, 465 U.S. 37, 50-51 (1984).  <u>See also</u> <u>McQueen v. Scroggy</u>, 99 F.3d 1302, 1333–34 (6th Cir. 1996), <u>overruled on other grounds</u>, <u>Abdur'Rahman v. Bell</u>, 392 F.3d 174 (6th Cir. 2004)("There is no federal constitutional requirement that a state appellate court conduct a comparative proportionality review.").  By statute, however, Ohio requires the appellate courts to engage in a proportionality review.  Under Ohio Revised Code § 2929.05(A):

> In determining whether the sentence of death is appropriate the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases.  They shall also review all the facts and other evidence to determine if the evidence

supports the finding of the aggravating circumstances the trial jury or the panel of three judges found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors.

Because Ohio law requires appellate courts to engage in proportionality review, the review must be consistent with constitutional requirements.  Kordenbrock v. Scroggy, 680 F. Supp. 867, 899 (E.D. Ky. 1988) (citing Evitts v. Lucey, 469 U.S. 387 (1985)).  Nonetheless, when the state courts have engaged in proportionality review, the district court's review is limited.  The district court is to examine the state's proportionality review only to determine whether the imposition of death on the petitioner is patently unjust or "shocks the conscience; the court is not to second-guess the state court's comparison of other cases in which the death penalty was imposed."  Id. (citing Moore v. Balkcom, 716 F.2d 1511, 1517 (11th Cir. 1983)).  See also Spinkellink v. Wainwright, 578 F.2d 582, 604 (5th Cir. 1978), cert. denied, 440 U.S. 976 (1979)(same).

In Spinkellink, the petitioner argued

that his crime, when compared to other Florida death penalty cases, was insufficiently gruesome or heinous to warrant the death penalty and had highlighted seven other cases in which the Florida Supreme Court had reversed death sentences.  All of these other cases allegedly involved defendants equally or more deserving of the death penalty than he.

Moore, 716 F.2d at 1517–18 (citing Spinkellink).  The court "condemned a federal case by case analysis of the cases used by the state appellate court in its proportionality review as an unnecessary intrusion on the [state] judicial system."  Id. (citing Spinkellink).

A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, 'get out the record' to see if the state court's findings of fact, their conclusions based on a review of similar cases, was supported by the 'evidence' in the similar cases.  To do so would thrust the federal judiciary into the substantive policy making area of the state.

99

Id. Moreover, when examining an Ohio death sentence on habeas review, the Sixth Circuit

stated that, because "proportionality review is not required by the Constitution, states have great

latitude in defining the pool of cases used for comparison." Buell v. Mitchell, 274 F.3d 337, 369

(6th Cir. 2001).

Recently, the Sixth Circuit reversed a death sentence on proportionality grounds, finding

that the disparity between the life sentence a defendant received in a murder for hire trial was

disproportionate to the death sentence the actual killer received. Getsy v. Mitchell, No. 03-3200,

2006 WL 2135493, at 27 (6th Cir. Aug. 2, 2006). It concluded that the petitioner's death

sentence, "while the arguably more culpable [murder for hire defendant] received a life sentence

for the *very same* crime, violates the Eighth Amendment, as construed by the Supreme Court in

Furman [v. Georgia, 408 U.S. 238 (1972)] and Enmund [v. Florida, 458 U.S. 782 (1982)], and its

prohibition of arbitrary and disproportionate death sentences." Id. (emphasis in the original).

In this case, however, the Ohio Supreme Court found that Phillips's sentence was

proportional both in comparison with Fae Evans's sentence and with other defendants who were

convicted of a single felony murder aggravating circumstance. It held:

> Finally, in his twenty-fifth proposition of law, appellant maintains that the
> sentence in this case is disproportionate to the penalty imposed in Evans's
> allegedly similar case. Evans was convicted of involuntary manslaughter with a
> specification, based upon child endangerment. She was not convicted of
> purposefully causing Sheila's death. Therefore, our proportionality consideration,
> as defined by R.C. 2929.05(A), does not extend to Evans's case.
>
> This court has upheld death sentences in cases which present only a single
> felony-murder aggravating circumstance. See, e.g. State v. Woodard, supra, 623
> N.E.2d 75 (aggravated robbery); State v. Fox (1994), 631 N.E.2d 124
> (kidnapping); State v. Franklin (1991), 580 N.E.2d 1 (aggravated burglary). In
> State v. Powell, supra, 552 N.E.2d 191, this court affirmed the death sentence of a
> defendant who was convicted of murder during the commission of kidnapping and
> attempted rape. Appellant's death sentence in this case is neither excessive nor

100

disproportionate.

State v. Phillips, 656 N.E.2d 643, 672 (Ohio 1995)(parallel citations omitted).

This decision is not clearly contrary to the Furman and Enmund decisions as interpreted by Getsy. Unlike the Getsy case, Phillips and Evans were not both charged with aggravated murder. More important than the charges, there is no evidence that Fae Evans was present during the fatal rape and beating of Sheila Evans. Thus, there were different degrees of involvement in the crime between the two co-defendants. Consequently, the Ohio Supreme Court's determination that their sentences were not disproportionate was not an unreasonable one. Finally, as the Sixth Circuit stated in Buell, states have wide latitude in determining which cases to use in comparing death sentences when undergoing a proportionality review. Accordingly, the Ohio Supreme Court's comparison with cases in which a defendant received a death sentence for a single felony murder was not constitutionally infirm. Phillips's twentieth ground for relief is not well-taken.

### 6. Twenty-First and Twenty-Second Grounds for Relief

Finally, Phillips asserts in his twenty-first and twenty-second grounds that the mitigating factors outweigh the aggravating circumstances. He claims that the trial court and court of appeals did not adequately weigh and re-weigh the mitigating factors and aggravating circumstances. He urges the Court to conduct its own re-weighing of the facts presented to the jury during trial.

A federal habeas court cannot provide redress for state law violations, nor does it act as a tertiary level of appellate review after a defendant's direct appeal and post-conviction relief motions. Allen v. Morris, 845 F.2d 610, 614 (6th Cir. 1988), cert. denied, 499 U.S. 1011 (1989).

101

To grant a petitioner habeas corpus relief, a federal habeas court must find a violation of the Constitution, laws or treaties of the United States.  28 U.S.C. § 2241; Pulley v. Harris, 465 U.S. 37, 41 (1984).  Because Phillips is merely asserting that this Court should re-weigh the mitigating factors and aggravating circumstances that the trial and appellate courts already have weighed, the Court cannot address this claim on habeas review.[28]

### K. Seventeenth Ground for Relief

In this ground for relief Phillips asserts that he was denied the right to a fair and impartial jury because the trial court denied his motion for a sequestered voir dire.  He argues that because they were not sequestered during questioning, venire members were not honest in answering counsel's sensitive sexual questions.  Phillips raised this claim on direct appeal to the Ohio Supreme Court.  That court found that the claim was waived because Phillips failed to raise it to the court of appeals and reviewed it for plain error.  Thus, this claim is procedurally defaulted.

Regardless of its defaulted status, this claim lacks merit.  First, there is no constitutional right to a sequestered voir dire.  Mu'Min v. Virginia, 500 U.S. 415 (1991).  Moreover, when reviewing this claim for plain error, the Ohio Supreme Court found that the trial court did not abuse its discretion when denying Phillips's sequestration motion.  It reasoned:

> In the case at bar, the prospective jurors were voir dired in groups of six individuals during which time attorneys for both parties were permitted to address the members of the venire with specific questions. Appellant suggests that the trial court's decision to question the jurors in small groups led to "the entire venire

---

[28]      Moreover, the Court observes that the Ohio Supreme Court conducted an extensive re-weighing of the aggravating circumstances and mitigating factors on direct appeal.  After meticulously recounting the mitigating factors Phillips presented during the penalty phase of trial, it concluded that they were outweighed by the aggravating circumstance beyond a reasonable doubt.  Phillips, 656 N.E.2d at 672.

102

> [being] contaminated by prejudicial remarks from individual jurors and from the
> State's attorneys," and "failed to elicit honest responses from the prospective
> jurors." Appellant's arguments are entirely unfounded and the proposition is
> meritless.

Phillips, 656 N.E.2d at 667.  The Court sees no flaws in the Ohio Supreme Court's logic.  More

importantly, other than mere conjecture, Phillips does not support his assertion that the jury that

was eventually empaneled was biased against him based on the trial court's decision to conduct a

small group voir dire.  Indeed, he points to nothing in the responses that were provided that

indicates evasiveness or hesitancy on these issues.  This claim is not well-taken.

### L. Twenty-Third Ground for Relief

Phillips's twenty-third ground for relief is that his appellate counsel were constitutionally

ineffective in violation of the Sixth Amendment.  He contends that appellate counsel did not

ensure that a complete record was filed on appeal because the record lacks the two jury questions

submitted to the trial court during guilt phase deliberations and the trial court's alleged response

to them.  Additionally, Phillips asserts a catch-all ineffective assistance of appellate counsel

claim in which he argues that all claims raised in the petition but found by this Court to be

procedurally defaulted because they were not raised on direct appeal are instances of appellate

counsel's ineffective assistance.

The Respondent alleges that these claims are unexhausted because Phillips never filed an

application to reopen his direct appeal pursuant to Ohio Rule of Appellate Procedure 26(B).

Under Ohio law, a claim of ineffective assistance of appellate counsel may be brought before the

Ohio court of appeals or Supreme Court of Ohio by way of an application to reopen the direct

appeal. State v. Murnahan, 63 Ohio St. 3d 60 (1992).  Phillips failed to file such an application in

the Ohio courts.  Thus, his ineffective assistance of appellate counsel claim is unexhausted.  A

habeas court may deny the claim on the merits, however, regardless of its exhausted status.  28 U.S.C. § 2254(b)(1)(2).

A defendant is entitled to effective assistance of counsel in his first appeal as a matter of right.  Evitts v. Lucey, 469 U.S. 387, 396 (1985).  The two-part test enunciated in Strickland, discussed above, is applicable to claims of ineffective assistance of appellate counsel.  Thus, Phillips must demonstrate that his appellate counsel's performance was deficient, and that the deficient performance so prejudiced him that the appellate proceedings were unfair and the result unreliable.  Strickland, 466 U.S. at 687.

Here, Phillips cannot demonstrate the prejudice necessary to succeed on an ineffective assistance of appellate counsel claim.  First, as is explained in ground for relief ten, there is no reason to believe that the trial court actually provided the jury with supplemental instructions in Phillips's or his counsel's absence.  Thus, Phillips cannot demonstrate that appellate counsel prejudiced the outcome of his appeal by failing to include something in the record which does not exist.  Moreover, because the Court finds none of Phillips's claims to be well-taken, despite their defaulted status, appellate counsel did not prejudice the outcome of Phillips's direct appeal as of right for failing to raise the other issues now asserted in this petition.  Thus, Phillips's ineffective assistance of appellate counsel claim has no merit.

### M. Twenty-Fourth Ground for Relief

Phillips claims that the Ohio post-conviction review system is inadequate because a post-conviction petitioner is not permitted to obtain discovery without first demonstrating that he is entitled to it by producing evidence *de hors* the record.  Phillips asserts this requirement creates a classic "Catch-22" situation in which he must support his claim with evidence he likely only

104

could obtain in court-ordered discovery. Thus, he claims that Ohio's post-conviction system violates his Fourteenth Amendment rights to due process and equal protection.

The Court declines to address the merits of the Phillips's claim because he fails to articulate any infringement for which a federal habeas corpus court can grant relief. The Sixth Circuit has held that, "habeas corpus is not the proper means by which prisoners should challenge errors or deficiencies in state post-conviction proceedings." Greer v. Mitchell, 264 F.3d 663, 681 (6th Cir. 2001)(*citing* Kirby v. Dutton, 794 F.2d 245 (6th Cir. 1986)). As the Greer Court observed, the United States Supreme Court has determined that states have no constitutional obligation to provide post-conviction remedies. Id. (*citing* Pennsylvania v. Finley, 481 U.S. 551, 557 (1987)).

Thus, because state post-conviction proceedings do not implicate a petitioner's constitutional rights, at least not constitutional rights amenable to redress through a habeas corpus petition, the Court will not review this claim and cannot provide Phillips habeas relief based on it.

### N. Twenty-Fifth Ground for Relief

Phillips asserts that he is entitled to habeas relief based on cumulative errors that occurred during his state court proceedings. The Court finds that it is foreclosed from reviewing these claims pursuant to the strictures of the AEDPA. As the Sixth Circuit has held, "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." Lorraine v. Coyle, 291 F.3d 416, 447 (6th Cir. 2002), amended on other grounds, 307 F.3d 459

(6th Cir. 2002), and cert. denied at, 538 U.S. 947 (2003).[29]  See also Gillard v. Mitchell, 445 F.3d

883, 898 (6th Cir. 2006)(*following* Lorraine and hold that, while errors might accumulate to

produce unfair trial setting, Supreme Court has never held distinct claims can accumulate to grant

habeas relief).  Accordingly, Phillips is not entitled to relief for this claim.


IX.    **CONCLUSION**

        The Court now must determine whether to grant a Certificate of Appealability ("COA")

for any of Phillips's claims.  The Sixth Circuit Court of Appeals has determined that neither a

blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a

capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability,

which ideally should separate the constitutional claims that merit the close attention of counsel

and this court from those claims that have little or no viability."  Porterfield v. Bell, 258 F.3d

484, 487 (6th Cir. 2001); see also Murphy v. Ohio, 263 F.3d 466 (6th Cir. 2001)(remanding

motion for certificate of appealability for district court's analysis of claims).  Thus, in concluding

this Opinion, this Court now must consider whether to grant a COA as to any of the claims

Phillips presented in his petition pursuant to 28 U.S.C. § 2253.

        That statute states in relevant part:

        (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may
        not be taken to the court of appeals from –

---

[29]    The Court acknowledges that, in a subsequent case, the Sixth Circuit granted
        habeas relief on cumulative error grounds.  DePew v. Anderson, 311 F.3d 742,
        751 (6th Cir. 2003).  Because the DePew petitioner had filed his petition prior to
        the AEDPA's effective date, however, the AEDPA provisions did not apply.  Id.
        at 748.

>(A) the final order in a habeas corpus proceeding in which the
>detention complained of arises out of process issued by a State
>court . . .

>(2) A certificate of appealability may issue under paragraph (1) only if the
>applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA

statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole

difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate

he was denied a <u>constitutional</u> right, rather than the federal right that was required prior to the

AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the

pre- and post-AEDPA versions of that statute in <u>Slack v. McDaniel</u>, 529 U.S. 473 (2000).  In that

case, the Court held that § 2253 was a codification of the standard it set forth in <u>Barefoot v.</u>

<u>Estelle</u>, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in

the statute.  <u>Id.</u> at 483.   Thus, the Court determined that

>"[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial
>showing of the denial of a constitutional right, a demonstration that, under
>*Barefoot*, includes showing that reasonable jurists could debate whether (or, for
>that matter, agree that) the petition should have been resolved in a different
>manner or that the issues presented were "'adequate to deserve encouragement to
>proceed further.'"

<u>Id.</u> at 483–04 (*quoting* <u>Barefoot</u>, 463 U.S. at 893 n.4).

The Court went on to distinguish the analysis a habeas court must perform depending

upon its finding concerning the defaulted status of the claim.  If the claim is not procedurally

defaulted, then a habeas court need only determine whether reasonable jurists would find the

district court's decision "debatable or wrong."  <u>Id.</u> at 484.  A more complicated analysis is

107

required, however, when assessing whether to grant a COA for a claim the district court has

determined is procedurally defaulted.  In those instances, the Court opined, a COA should only

issue if "jurists of reason would find it debatable whether the petition states a valid claim of the

denial of a constitutional right and that jurists of reason would find it debatable whether the

district court was correct in its procedural ruling."  Id.  (emphasis supplied).

After taking the above standard into consideration, the Court finds that six issues

arguably merit further review.[30]  The Court will address each issue and its procedural status

below.

The Court will not issue a COA for some of the grounds for relief Phillips raised in the

petition because they are unequivocally procedurally defaulted.  As stated above, a claim

addressed by the Ohio Supreme Court pursuant to a plain error analysis does not constitute a

waiver of procedural default.  Seymour v. Walker, 224 F.3d 542 (6th Cir. 2000).  Because

grounds for relief 4, 9, 11, 12, 14, 15, 16, and 17 were all reviewed under this standard, they are

procedurally defaulted.  Additionally, the Court finds that grounds for relief 7, part of 10, and 24

were improperly raised in the Ohio courts and barred on grounds of res judicata.  Finally, ground

for relief 23 is both unexhausted and procedurally defaulted.  Thus, no COA will issue for these

claims.

Conversely, the Court will issue a COA for grounds for relief 1, 2, and 3 (insufficient

evidence to convict of aggravated murder, insufficient evidence of intent to kill, and insufficient

---

[30]     While the Court finds that it could reasonably deny a COA on most of these
        grounds, as it does on all others asserted in the petition, the question on these
        claims is close enough that, out of an abundance of caution, it has chosen to
        submit them for possible appellate review.

evidence that rape occurred on the day of the murder).  While the Court found that the Ohio

Supreme Court was not unreasonable in finding that a rational jury, when viewing the evidence

in a light most favorable to the prosecution, could find sufficient evidence to support an

aggravated murder conviction with a capital specification under <u>Jackson</u>, a reasonable jurist

could conclude that Dr. Cox's testimony was insufficient proof to infer Phillips's intent to kill or

to prove that Sheila was penetrated with a penis (and, thus, raped within the meaning of Ohio

law) on the morning of her death.

Additionally, the Court will issue a COA for ground for relief 5 (grand juror statements to

Phillips's jury).  Although the trial court conducted an individual voir dire of each juror as well

as the grand juror who made the improper statements, a jurist of reason could conclude that,

pursuant to <u>Smith v. Phillips</u>, 455 U.S. 209, 217 (1982), a juror who was subject to the comments

made by the grand juror would feel under pressure to sentence Phillips to death.  Thus, the Court

issues a COA for this ground.

The Court issues a COA for ground for relief 6 (ineffective assistance of counsel), for the

sub-claim concerning ineffective assistance of counsel during mitigation only.  The Court finds

that jurists of reason would not debate the Court's findings regarding Phillips's ineffective

assistance of counsel during voir dire sub-claims because counsel adequately questioned the

venire and had no basis to object to its makeup.  It also will not issue a COA for the sub-claims

relating to the jury instructions and the failure to raise the collateral estoppel issue for the reasons

the Court states in those distinct grounds for relief.

While it is a very close question, the Court finds, however, that a jurist of reason could

debate the Court's finding regarding the ineffective assistance of counsel during mitigation

109

claims.  Contrary to the Court's findings, a reasonable jurist could arguably conclude that trial counsel did not adequately investigate because they, for whatever reason, did not procure the CSB records that showed some level of abuse in the Phillips family.  Additionally, a jurist of reason could conclude that constitutionally adequate counsel would have attempted to obtain a mitigation specialist once counsel realized that the investigator they procured would be of little aid to them.  Finally, a reasonable jurist could find that counsel was deficient for failing to provide Dr. Brown with more information regarding troubles in the Phillips family in order to bolster his testimony.  Thus, the Court issues a COA for this sub-claim of Phillip's sixth ground for relief.

No jurist of reason would find the Court's decision to deny Phillips's eighth ground for relief (introduction of gruesome photographs and slides) to be debatable.  A reasonable jurist would not find that the introduction of this evidence shocks the conscience because it was probative of the issues of rape and murder.  No COA will issue for this claim.

Conversely, the Court will issue a COA for Phillips's tenth ground for relief (defendant not present when jury asked questions during deliberations).  Because a jurist of reason could conclude that Phillips was denied the opportunity to be present during a potentially critical phase of the trial, the Court issues a COA for this ground.

No jurist of reason would find equivocal the Court's decision to deny Phillips's thirteenth ground for relief (involuntary confession).  As the Ohio Supreme Court reasoned, the trial court correctly concluded that there was no evidence of coercion in Phillips's confession.  Accordingly, the Court will not issue a COA for this claim.

No COA will issue for claims 18, 19, 20, 21, and 22 (proportionality review and

110

unconstitutionality of the death penalty).  The Court will not grant a COA for numerous claims which occur almost pro forma in a capital habeas petition but are routinely denied.

The Court will not grant a COA for ground for relief 25.  As stated in the Opinion, the Sixth Circuit has held that distinct constitutional claims can not be cumulated to grant habeas relief.  Lorraine v. Coyle, 291 F.3d 416, 447 (6th Cir. 2002).  No jurist would debate this finding.

Finally, the Court has observed from prior capital habeas cases that counsel for the losing party routinely file a motion for reconsideration.  Counsel are advised that attorneys in capital cases are not immune from sanctions where motions are unfounded or are filed for purely tactical reasons unrelated to the merits of the positions taken therein.  If counsel file a frivolous motion for reconsideration in this, as in any case, they may be required to reimburse the opposing party for the attorneys' fees and expenses incurred in responding to such motions.  See Davie v. Mitchell, 291 F.Supp.2d 573, 634 (N.D. Ohio  2003)(Gwin, J.); Baston v. Bagley, 282 F.Supp.2d 665, 673 (N.D. Ohio 2003)(Carr, C.J.); Haliym v. Mitchell, No. 1:98CV1703, (slip op.) at 158-59 (N.D. Ohio Jan. 20, 2004)(Polster, J.).  Where counsel filing an unsuccessful motion for reconsideration are otherwise to be compensated under the Criminal Justice Act, moreover, counsel will not be compensated for the time expended in preparing and filing such motions if this Court finds the motion to be frivolous or asserted solely for purposes of delay.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal in forma pauperis would not be frivolous and can be taken in good faith.

**IT IS SO ORDERED.**

s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

DATED:  September 29, 2006

111